## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

---

GRACIE MICHAEL Individually and as
Personal Representative for the Estate of
Tiffany Davis, Deceased

      PLAINTIFF

    -vs-                                   Case No.

                                               HON.

COUNTY OF MUSKEGON, a municipal corporation, and
SHERIFF MICHAEL POULIN; LT. MATTHEW SMITH;
DEPUTY RICHARD VAN AMBURG; DEPUTY CHRISTOPHER ROOT;
DEPUTY SCOTT SMITH; DEPUTY JAMAL LANE;
DEPUTY TIFFANY TEMPLE; DEPUTY CARRIE SCHUBERT;
DEPUTY SHAWN AHRENS;
and other UNKNOWN DEPUTIES;
WELLPATH, LLC, formerly known as CORRECT CARE SOLUTIONS, LLC;
JOSEPH NATOLE, JR., M.D. P.C.; DR. JOSEPH NATOLE, MD;
HEATHER IHRIG; DAVID LOPEZ, LPN;
DANIELLE CARLSON, RN; CARLEEN BLANCHE, RN;
BRITNI BRINKMAN, EMT; SARA BRUCE, EMT;
JESSICA ANN FAIRBANKS, LPN; KATY CASTILLO, LPN;
JANE DOE; and JOHN DOE;
Individually, and in their official / supervisory capacities,
Jointly and Severally,

      DEFENDANTS.                            JURY TRIAL DEMANDED
_____/

**MARCEL S. BENAVIDES (P69562)**
THE MARCEL S. BENAVIDES LAW OFFICE
Attorney for PLAINTIFF
801 West Eleven Mile Rd. Ste. 130
Royal Oak, MI 48067
(248) 549-8555
benavideslaw@att.net
_____/

## COMPLAINT AND JURY DEMAND

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.

**NOW COMES** the PLAINTIFF, Gracie Michael, individually and as Personal Representative for the Estate of Tiffany Davis ("Tiffany Davis"), and through her attorney, **MARCEL S. BENAVIDES**, and for her complaint against Defendant County of Muskegon ("Defendant Muskegon County"), Muskegon County Sheriff Michael Poulin ("Defendant Sheriff Poulin"), Lieutenant Matthew Smith ("Defendant Lt. Smith"), Deputy Richard Van Amburg ("Defendant Deputy Van Amburg"), Deputy Christopher Root ("Defendant Deputy Root"), Deputy Scott Smith ("Defendant Deputy Smith"), Deputy Jamal Lane ("Defendant Deputy Lane"), Deputy Tiffany Temple ("Defendant Deputy Temple"), Deputy Carrie Schubert ("Defendant Deputy Schubert"), Deputy Shawn Ahrens ("Defendant Deputy Ahrens"), and Unknown Muskegon County Deputies ("Unknown Defendant Deputies"), Wellpath, LLC, formerly known as Correct Care Solutions, LLC ("Defendant Wellpath"), Joseph Natole, Jr. MD PC ("Defendant Joseph Natole, Jr. MD PC"), Dr. Joseph Natole, MD ("Defendant Dr. Natole"), Heather Ihrig ("Defendant Heather Ihrig"), David Lopez, LPN ("Defendant David Lopez, LPN"), Danielle Carlson, RN ("Defendant Danielle Carlson, RN"), Carleen Blanche, RN ("Defendant Carleen Blanche, RN"), Britni Brinkman, EMT ("Defendant Britni Brinkman, EMT"), Sara Bruce, EMT ("Defendant Sara Bruce, EMT"), Jessica Ann Fairbanks, LPN ("Defendant Jessica Fairbanks, LPN"), Katy Castillo, LPN ("Defendant Katy Castillo, LPN"); Jane Doe and John Doe.

Collectively, Defendant Deputy Van Amburg, Defendant Deputy Root, Defendant Deputy Smith, Defendant Deputy Lane, Defendant Deputy Temple, Defendant Deputy Schubert,

Defendant Deputy Ahrens, and Unknown Defendant Deputies hereinafter referred to as "Defendant Deputies;"

Collectively, Defendant Dr. Natole, Defendant Heather Ihrig, Defendant David Lopez, LPN, Defendant Danielle Carlson, RN, Defendant Carleen Blanche, RN, Defendant Britni Brinkman, EMT, Defendant Sara Bruce, EMT, Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, Jane Doe and John Doe, hereinafter referred to as "Defendant Medical Personnel;" states as follows:

## **INTRODUCTION**

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Decedent, Tiffany Davis', and PLAINTIFF's rights as secured by the United States Constitution.

2.      The events that gave rise to this complaint began on February 18, 2020, and culminated with the completely senseless death of Tiffany Davis whereupon she was pronounced brain dead on February 21, 2020, and her organs were harvested on February 24, 2020. All above named Defendants caused the death of Tiffany Davis by continuously violating her constitutional rights. For multiple days while at the Muskegon County Jail, Tiffany Davis endured a complete breakdown of her body as a result of complications of acute widespread cerebral hemorrhagic infarcts due to invasive pneumococcal disease of uncertain origin.

3.      After days of suffering at the Muskegon County Jail, Tiffany Davis was ultimately diagnosed at the hospital and later confirmed via her autopsy to be infected by streptococcus pneumoniae, which causes pneumonia or more serious blood infections. The bacteria is fostered by cramped, airless conditions such as in overcrowded and tightly confined jails typically with poor ventilation. The bacteria is mainly spread from person to person by the breathing of droplets

produced by an infected person during coughing or sneezing. Streptococcus pneumonia is the most common cause of bacterial meningitis in adults and causes sepsis, which are manifestations of a severe infection. Meningitis is when the infection reaches the lining around the brain and spinal cord. Sepsis is a life-threatening condition due to dysregulation of the body's response to infection that induces damage to its own tissues and organs. The Center for Disease Control states that symptoms of sepsis include fever, headache, nausea, vomiting, photophobia, confusion, and seizures, which can be convulsive or nonconvulsive. Early sepsis treatment usually requires intravenous (IV) fluids and antibiotics. It is essential that the treatment begin as early as possible. The chance of sepsis progressing to severe sepsis and septic shock, causing death, rises by 4% to 9% for every hour that treatment is delayed. Tiffany Davis' meningitis and sepsis went untreated by Defendant Deputies and Defendant Medical Personnel for nearly 36 hours. The Center for Disease Control provides that sepsis is a life-threatening medical emergency that needs timely treatment since it can lead to tissue damage, organ failure and death as illustrated in this case.

4.       Septic emboli, which are infected blood clots that arise from a site of infection can travel through the blood stream, to the brain, and to the cerebral circulation leading to embolic infarcts and cerebral hemorrhages (brain bleeding). As a result of septic emboli, Tiffany Davis suffered from 7 points of intraparenchymal hemorrhages (bleeding within the brain tissue) in her brain along with subarachnoid hemorrhaging (bleeding in the space between the brain and the surrounding membrane).  Symptoms often include headaches, seizures, and focal neurological deficits, such as speech, vision, and hearing problems. The severity and type of symptoms may depend on the location of the bleed within the brain. Other common signs include nausea and vomiting, lethargy, limb weakness, and sensory defects, such as numbness of the face and limbs. If the bleed is large, individuals may experience impaired consciousness. Tiffany Davis exhibited

the stated numerous symptoms as her brain bled for days while the Defendant Deputies and Defendant Medical Personnel did nothing to assist her with her serious medical needs.

5.      The deliberate indifference of the Defendant Deputies and Defendant Medical Personnel caused her to develop severe sepsis, encephalopathy, ventilator dependent respiratory failure, thrombocytopenia, and transaminitis that contributed to her death. Tiffany experienced days of critical neurological emergencies such as seizure activity and/or decerebrate posturing, notably on February 18th and 19th 2020, that were apparent to all that encountered her.[1] Defendant Deputies and Defendant Medical Personnel named herein either personally witnessed the serious medical needs, such as seizures and/or decerebrate posturing and/or symptoms of experiencing brain bleeds, or were specifically told by either Tiffany Davis or other inmates numerous times that she was experiencing serious medical conditions (seizures) and/or life threatening medical conditions that needed emergency care. From the early morning hours of February 18, 2020, until she was transferred to the hospital from the Muskegon County Jail during the late afternoon hours of February 19, 2020, Tiffany Davis and others complained to Defendant Deputies and Defendant Medical Personnel of her suffering from headache, severe pain, nausea, vomiting, seizures, involuntary movements, and photophobia. She also physically exhibited signs and symptoms indicative of her life threatening medical conditions including but not limited to seizures (generalized onset seizures and/or focal onset seizures), decerebrate posturing, tremors, confusion, dizziness, lack of balance, hypertension, fever, vomiting, tachycardia, not being alert or oriented, not responding to verbal commands or painful stimulation, dilated pupils, agitation, severe frontal lobe head pain, and an abnormal urinalysis result (with negative drug toxicology and negative

---

[1] Decerebrate posturing is an abnormal body posture that involves the arms and legs being held straight out, the toes being pointed downward, and the head and neck being arched backward. The muscles are tightened and held rigidly. This type of posturing usually means there has been severe brain damage to the brain.

pregnancy results.)  The decerebrate posturing, seizures, and ill effects of the sepsis, including the complications of acute widespread cerebral hemorrhagic infarcts went untreated and ignored by the Defendant Deputies and Defendant Medical Personnel. Tiffany Davis died from complications of acute widespread cerebral hemorrhagic infarcts due to invasive pneumococcal disease. Doctors at Hackley Hospital within hours of her arrival from the jail would later conclude that Tiffany was suffering from acute encephalopathy with multiple bilateral intra-parenchymal hemorrhages, severe sepsis with septic shock with strep bacteremia, ventilator dependent respiratory failure, lactic acidosis, thrombocytopenia, and transaminitis. Tiffany died a slow death as a result of not being medically cared for due to the deliberate indifference to her serious medical needs by the Defendant Deputies and Defendant Medical Personnel as they did nothing to help her. Tiffany Davis' death was completely and utterly preventable but for the conduct of Defendants. Yet, this case is another example of the deliberate indifference towards the inmate population at the Muskegon County Jail, one year after the eerily similar in-custody death of inmate Paul Bulthouse, who was also a victim of deliberate indifference to his serious medical needs as he suffered from status epilepticus seizures for days until he died in a pool of his own urine on the floor in the Muskegon County Jail due to the unconstitutional conduct of Defendant Muskegon County deputies and Defendant Wellpath medical personnel some of whom are the same individual defendants named in this case. [2]

---

[2] *Bulthouse v. County of Muskegon et al*., 21cv00281 (W.D. Mich. 2021), is the civil rights case filed on behalf of the Estate of Paul Bulthouse, who was incarcerated in the Muskegon County Jail and died on April 4, 2019, while multiple Defendant Muskegon County Sheriff deputies and multiple Defendant Wellpath medical personnel (some named again in this suit) were alleged to be deliberately indifferent to his serious medical needs. Paul Bulthouse went untreated for days for his serious medical condition of status epilepticus (multiple seizures) that caused his death in a jail cell. The civil case recently settled against Defendant Muskegon County and Defendant Wellpath. However, the Attorney General of Michigan has brought involuntary manslaughter charges against various individual defendants and the matter has been bound over to the Muskegon County Circuit Court for further proceedings. As of the filing of this complaint, there is yet another

6.     Defendants' unconstitutional actions by way of some examples include but are not limited to not providing Tiffany Davis necessary medical care for her bacterial infection, sepsis and brain bleeds, by not performing appropriate lab testing on her to quickly diagnose the infection, not requesting advance medical care, not providing an antibiotic or any other medicine to treat the infection, ignoring her serious injuries and critical mental health needs, failing to ensure adequate nourishment and hydration despite her own inability to meet those essential needs, detaining her under inhumane conditions of confinement where she experienced cruel and unusual punishment, otherwise forcing her to endure extreme and needless pain and suffering; and not conducting medical evaluations and assessments where she was permitted to get sicker with sepsis and brain bleeding ultimately experiencing death; observing her sustain numerous seizures in person or ignoring reported seizures; and simply not providing medical attention to her serious medical needs ultimately causing her death.

7.     Following yet another senseless tragedy, Defendant Muskegon County and Defendant Wellpath, embarked on an effort to cover up the circumstances surrounding the death of Tiffany Davis as they did in the prior jail death of victim, Paul Bulthouse. Through its agents and officials, Defendant Muskegon County and Defendant Wellpath conducted a biased death investigation to conceal the unconstitutional conduct alleged herein. They also wrongfully withheld critical information from the Medical Examiner's Office who was responsible for determining the causes leading to her death. The Medical Examiner's Office was not supplied with all of the jail videos that truly depict Tiffany's serious medical needs and her deteriorating conditions in the various holding cells over the 2 days that she was held in before her death despite

---

inmate death at the Muskegon County Jail under the control of Defendant Sheriff Poulin which occurred on December 11, 2021. The death of Marleon Danell Johnson is currently being investigated directly by the Michigan State Police.

the Medical Examiner's repeated requests for all videos. Upon information and belief, numerous requests were made by the Medical Examiner's Office for all of the videos, but those requests went ignored as the Muskegon County Sheriff's Office stated that no such videos existed when they in fact did. This act was clearly to try to limit the exposure of the Defendants to the public eye in their attempts to insulate its deputies and medical personnel from both criminal and civil liability.

8.     As part of Defendant Sheriff Poulin's sham tactics, he commandeered his department to go on a mission in an attempt to blame Tiffany Davis for her own death. His subordinates framed the investigation to put blame on Tiffany Davis as an individual who had caused her very own serious medical condition by ingesting contraband, when in fact his own jail records indicated she tested negative twice for drugs on February 18, 2020, and both the hospital and the medical examiner's blood toxicology revealed zero unlawful substances found in her blood, thus, shutting down that investigation and Defendant Sheriff Poulin and Defendant Lt. Smith's effort to place blame on others for yet another unnecessary death in their jail.

9.     Once learning that Tiffany Davis did nothing to do to contribute to her death, Defendant Sheriff Poulin and Defendant Lt. Smith then invoked yet another sham investigation by coordinating with their friendly colleagues of neighboring police departments to investigate Tiffany Davis' death by, upon information and belief, only interviewing in-person various Defendant Wellpath Medical Personnel, which was recorded/transcribed, and not interviewing Defendant Muskegon County deputies in-person, but rather allowing them to submit only a written report. Like the investigation in the Paul Bulthouse matter, this criminal investigation was once again biased since the investigation was formulated to find no criminal fault with the Muskegon County Sheriff's Department and/or Defendant Wellpath. In fact, prior to the investigation, Defendant Sheriff Poulin privately met with Defendant Carleen Blanch, RN, who had disgruntledly resigned from Defendant Wellpath just days after the death of Tiffany Davis, to

speak to her before she would be interviewed by the investigators. This investigation, like in the Paul Bulthouse matter, found no criminal liability since Defendant Carleen Blanche, RN, who lied to the investigators about her very own conduct, indicated in her persuasive opinion to them that the deputies who watched Tiffany Davis did all that they could do as law enforcement officers while she imputed blame on other Defendant Wellpath employees and Defendant Wellpath's custom/policies as the cause for Tiffany Davis' death.  In return, the friendly criminal investigators chose not to charge any individuals involved in this case despite facts to the contrary that supported criminal conduct similar to what occurred as a result of the friendly criminal investigation in the Paul Bulthouse matter.

## JURISDICTION & VENUE

10.     This Court has jurisdiction of this action under the provisions of Title 28 of the United States Code, Sections 1331, 1367, 1343, and 42 USC §1983 and also has pendent jurisdiction over all state claims that arise out of the nucleus of operative facts common to Plaintiff's federal claims.

11.     Venue is proper under 28 U.S.C. § 1391 (b) as the events giving rise to the claims asserted in this complaint occurred within this District.

12.     This is a civil action brought pursuant to the Civil Rights Act, 42 U.S.C. §1981, *et seq*., seeking monetary and punitive damages against Defendants under 42 U.S.C. §1983, and costs and attorney fees under 42 U.S.C. §1988, for violations of Plaintiff's rights under the 4th, 8th, and/or 14th Amendments of the United States Constitution.

13.     That Plaintiff brings this suit against each and every Defendant in both their individual and official capacities. That upon information and belief all named individual defendants are residents of the State of Michigan.

14.     That each and every act of all Defendants, as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws, and customs, and by virtue of, and under the authority of the color of law and such actions were performed in the course and scope of employment of each individual Defendant.

15.     That the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs, interest, and attorney fees.

## PARTIES

A. Plaintiff

16.     PLAINTIFF, Gracie Michael, the mother of Decedent Tiffany Davis, is a resident of the County of Muskegon, State of Michigan.  Plaintiff is the duly appointed Personal Representative of the Estate of Tiffany Davis and files this lawsuit in both her individual and her representative capacity.

17.     Decedent, Tiffany Davis, was a 39-year-old woman that was incarcerated at the Muskegon County Jail at the times of the events at issue in this case as a pretrial detainee awaiting disposition for a pending violation of probation matter as she was unable to post her bond and as a sentenced inmate.

B. Muskegon County Defendants:

18.     Defendant Muskegon County, at the times of the events at issue in this case is a municipal corporation located in the County of Muskegon, State of Michigan who is responsible for providing professional and responsive health care for the inmates, who are pretrial detainees and convicted inmates, at the Muskegon County Jail. All pretrial detainees and/or inmates are entitled to protection under the 14th Amendment to the United States Constitution.

19.     Defendant Muskegon County is liable under state and/or federal law for all injuries proximately caused by: intentional, willful and wanton, reckless, deliberately indifferent, grossly

negligent and/or negligent acts and/or omissions committed pursuant to customs, policies, usage and/or practices which deprive citizens of their rights, privileges and/or immunities secured by the Constitutions and laws of the United States and/or of the State of Michigan.

20.    Defendant Muskegon County contracted with one or more private individuals and corporate entities to provide medical care and other services to its population of pretrial detainees and convicted inmates.

21.    Defendant Sheriff Poulin, in his official capacity, at the times of the events at issue in this case is the Sheriff of Muskegon County, was at all relevant times a Muskegon County agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. Defendant Sheriff Poulin is a final policymaker for Muskegon County, with respect to all matters concerning the Muskegon County Sheriff's Office and all of its divisions, including the Muskegon County Jail and is being named for the causes of actions in this complaint in both his official and individual capacities. As all times relevant to the events at issue in this case, Defendant Sheriff Poulin promulgated rules, regulations, policies, and procedures as Sheriff of Muskegon County for the provision of certain medical care to the pretrial detainees and inmates at the Muskegon County Jail. He is a resident of the State of Michigan.

22.    Defendant Lt. Smith, at the times of the events at issue in this case, was a supervising deputy, an agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. Defendant Lt. Smith was the Muskegon County Sheriff's Office Jail Administrator at the times of the events at issue in this case. Defendant Lt. Smith promulgated rules, regulations, policies, and procedures as an agent of the Sheriff of Muskegon County for the provision of certain medical care to the pretrial detainees and inmates at the Muskegon County Jail and is being named for the causes of actions in this complaint in both his official and individual capacities. He is a resident of the State of Michigan.

23.     Defendant Deputy Van Amburg at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

24.     Defendant Deputy Root at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

25.     Defendant Deputy Smith at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

26.     Defendant Deputy Lane at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of his employment. He is a resident of the State of Michigan.

27.     Defendant Deputy Temple at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of her employment. She is a resident of the State of Michigan.

28.     Defendant Deputy Schubert at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of her employment. She is a resident of the State of Michigan.

29.     Defendant Deputy Ahrens at the times of the events at issue in this case was a deputy, agent and /or employed by Defendant Muskegon County, and acting under color of law and within the scope of her employment. She is a resident of the State of Michigan.

C.   Wellpath (F/K/A Correct Care Solutions) Defendants:

30.     On or about February 24, 2020, and at all times relevant to the events at issue in this case, Wellpath, LLC, formerly known as Correct Care Solutions ("Defendant Wellpath") was

a Kansas corporation, licensed to do business in the State of Michigan, registered agent Corporate Creations Network, Inc., under contract with Muskegon County to furnish medical care to pretrial detainees and inmates incarcerated at the Muskegon County Jail. In its capacity as a contractor to Defendant Muskegon County, Defendant Wellpath promulgated rules, regulations, policies, and procedures for the medical screening, medical treatment, and overall medical care of pretrial detainees and inmates at the Muskegon County Jail, including Tiffany Davis. Defendant Wellpath's policies were implemented by and through its employees including the individual Defendant Medical Personnel, who were responsible for the medical care of the inmates at the Muskegon County Jail. In its capacity as a contractor to Defendant Muskegon County, through the Muskegon County Sheriff's Office, Defendant Wellpath was, at all times relevant hereto, acting under color of law, considered a person and is properly sued under 42 USC § 1983.

31.     On or about February 24, 2020, and at all times relevant to the events at issue in this case, Joseph Natole, Jr. MD PC ("Defendant Joseph Natole, Jr. MD PC") was a Michigan corporation which conducted business in the City of Muskegon, County of Muskegon, State of Michigan.

32.     On or about February 24, 2020, and at all times relevant to the events at issue in this case, Defendant Dr. Natole of Defendant Joseph Natole Jr. MD PC, State of Michigan registered agent Joseph Natole, Jr., MD, was upon information and belief, a Board Certified Family Practice Physician who is licensed to practice medicine in the State of Michigan, who conducted business in the City of Muskegon, County of Muskegon, State of Michigan, and is being sued herein in his individual capacity and official capacity. Upon information and belief, Defendant Dr. Natole was employed by Defendant Wellpath as the Medical Director of the Muskegon County Jail. As such, Defendant Dr. Natole was a supervising medical personnel, a final policymaker for Defendant Wellpath and had final authority to and did promulgate rules, regulations, policies and

13

procedures as Medical Director of the Muskegon County Jail for the provision of certain medical care, including screening, care of, and administration of medication to pretrial detainees and inmates at Muskegon County Jail, by all medical care providers such as nurses, doctors, and emergency medical technicians, and medical assistants employed at Muskegon County Jail. Defendant Dr. Natole's policies were implemented by and through Defendant Wellpath employees and Muskegon County Sheriff employees, who were responsible for the medical care of pretrial detainees and inmates at Muskegon County Jail, including Tiffany Davis, where Defendant Dr. Natole supervised the medical care personnel. As such, Defendant Dr. Natole was acting under color of law. He is a resident of the State of Michigan.

33.     Defendant, Heather Ihrig, at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a medical assistant at the Muskegon County Jail who was responsible for the provision of medical care of pretrial detainees and inmates, including Tiffany Davis, while detained at the Muskegon County Jail. She is a resident of the State of Michigan.

34.     On or about February 24, 2020, and at all times relevant to the events at issue in this case, Defendant David Lopez, licensed practical nurse ("Defendant David Lopez, LPN"), was employed by Defendant Wellpath as the Health Services Administrator and/or the site Manager of the Medical Department of the Muskegon County Jail. As such, Defendant David Lopez, LPN, was also a supervisor and final policymaker for Defendant Wellpath and had final authority to and did promulgate rules, regulations, policies and procedures as the Health Services Administrator and/or the site Manager of the Medical Department of the Muskegon County Jail for the provision of certain medical care, including screening, care of, and administration of medication to inmates at Muskegon County Jail, by medical care personnel such as medical assistants, nurses and emergency medical technicians, employed at Muskegon County Jail. Defendant David Lopez',

LPN, policies were implemented by and through Defendant Wellpath and Muskegon County Sheriff's Office employees including the individual Defendant Medical Personnel, who were responsible for the medical care of pretrial detainees and inmates at Muskegon County Jail, including Tiffany Davis. On or about February 24, 2020, and at all times relevant to the events at issue in this case, Defendant David Lopez, LPN, also acted as the supervisor of all medical assistants, nurses, and emergency medical technicians employed at Muskegon County Jail and was also responsible for the provision of medical care, treatment, medication to and the welfare of pretrial detainees and inmates, including Tiffany Davis, while detained at the Muskegon County Jail. As such, Defendant Lopez, LPN, was acting under color of law. He is a resident of the State of Michigan.

35.    Defendant Danielle Carlson, RN, at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a nurse at the Muskegon County Jail who was responsible for the provision of medical care, treatment, medication to and the welfare of pretrial detainees and inmates, including Tiffany Davis, while detained at the Muskegon County Jail. She is a resident of the State of Michigan

36.    Defendant Carleen Blanche, RN, at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a nurse at the Muskegon County Jail who was responsible for the provision of medical care, treatment, medication to and the welfare of pretrial detainees and inmates, including Tiffany Davis, while detained at the Muskegon County Jail. She is a resident of the State of Michigan.

37.    Defendant Britni Brinkman, EMT, at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the

scope of her employment as an emergency medical technician at the Muskegon County Jail who was responsible for the provision of medical care, treatment, life support, medication to and the welfare of pretrial detainees and inmates, including Tiffany Davis, while detained at the Muskegon County Jail. She is a resident of the State of Michigan

38.     Defendant Sara Bruce, EMT, at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as an emergency medical technician at the Muskegon County Jail who was responsible for the provision of medical care, treatment, life support, medication to and the welfare of pretrial detainees and inmates, including Tiffany Davis, while detained at the Muskegon County Jail. She is a resident of the State of Michigan.

39.     Defendant Jessica Fairbanks, LPN, at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a nurse at the Muskegon County Jail who was responsible for the provision of medical care, treatment, medication to and the welfare of pretrial detainees and inmates, including Tiffany Davis, while detained at the Muskegon County Jail. She is a resident of the State of Michigan

40.     Defendant Katy Castillo, LPN, at the times of the events at issue in this case was an agent and /or employed by Defendant Wellpath, acting under color of law and within the scope of her employment as a nurse at the Muskegon County Jail who was responsible for the provision of medical care, treatment, medication to and the welfare of pretrial detainees and inmates, including Tiffany Davis, while detained at the Muskegon County Jail. She is a resident of the State of Michigan.

D. Unknown Defendants:

41.     Following the death of Tiffany Davis, multiple lawful requests for information were issued to both the Muskegon County Sheriff's Department and to Defendant Wellpath by a variety of state agencies, including attorneys representing her estate. It is uncertain if all records have been tendered and as such, it is anticipated that Plaintiff will amend this complaint by naming those parties identified in discovery that are presently not known.

## FACTS

42.     This claim involves yet another death in the Muskegon County Jail within a very short period of time. It is the tragic death of Tiffany Davis, that occurred on February 24, 2020, which was the result of the senseless pain and agony that she endured for days while she was incarcerated at the Muskegon County Jail. It is once again another example of the deliberate indifference acts of the Defendants to a serious medical need of an in-custody individual.

43.     Tiffany Davis entered the Muskegon County Jail on January 4, 2020. She was screened by medical and jail personnel and permitted to be in general population as a pretrial detainee with no medical needs of any kind that required emergency care.

44.     On February 18, 2020, at approximately 4:30 a.m. during breakfast in the common area of Q pod, Tiffany Davis began experiencing severe pain in her head. The unknown deputy at the desk was notified of her pain and was told that Tiffany Davis was not feeling well. While in her cell, Q15, with bunkmate, Keri Smith, Tiffany Davis' pain greatly increased, and she developed a fever as she groaned in extreme discomfort. As a result of the medical emergency, Keri Smith hit Q15 cell's emergency call button at approximately 6:30 a.m. and explained the medical emergency to Defendant Deputy Van Amburg via the intercom.

45.     Defendant Deputy Van Amburg told Tiffany Davis and Keri Smith that they would need to wait for the usual rounds of the medical cart which would occur between 7:00 a.m. and 8:00 a.m. After several minutes of waiting and Tiffany Davis' condition worsening, Keri Smith hit the emergency button again to request medical attention. Keri Smith was told that Tiffany Davis would need to walk to the cell door to be evaluated by medical. Keri Smith explained to Defendant Deputy Van Amburg that Tiffany Davis would not be able to get down from her bunk due to her worsening condition. Tiffany Davis was shaking uncontrollably, she yelled out in pain and stated she was freezing even though she was exhibiting a fever. Keri Smith explained to Defendant Deputy Van Amburg that it was an emergency and to please tell the medical staff to hurry to their cell.

46.     Nearly an hour later and after completing the routine passing out of medications to various other inmates in other pods, the medical assistant, Defendant Heather Ihrig, finally arrived to cell Q15 at approximately 7:40 a.m. with Defendant Deputy Van Amburg. Defendant Deputy Van Amburg observed Tiffany Davis during the evaluation and mocked her by stating that her "shaking was a nice touch" insulting her medical emergency of having an active seizure and not calling 911.

47.     Defendant Heather Ihrig charted in her report regarding Tiffany Davis that she was asked to see an inmate in her cell due to her inability to move and because of a bad headache; she reported that she observed Tiffany Davis "laying down on the top bunk covering her eyes stating that the light hurt them" and that she was nauseous; that upon touching Tiffany Davis' arm she was "very hot to the touch;" that she had no thermometer available to take Tiffany Davis' temperature; that Tiffany Davis was "shakey [sic] and sweaty;" her blood pressure was very high at 159/107 with a pulse of 112; that before Tiffany Davis could take the offered pain medication for her headache "she threw up a significant amount in her bunkies tote" and "started shaking."

Without a doubt, Tiffany Davis exhibited signs of a serious medical condition due to the observation of the light sensitivity, the fever, the high blood pressure, headache, vomiting and the seizure, but yet there was no call for emergency care by either Defendant Ihrig and Defendant Deputy Van Amburg.

48.     Keri Smith told Defendant Heather Ihrig that Tiffany Davis was completely disoriented. Tiffany Davis' vomit was in plain view of Defendant Heather Ihrig and Defendant Deputy Van Amburg. Tiffany Davis was unable to speak in coherent sentences to Heather Ihrig and her seizures, all in the presence of both Defendant Heather Ihrig and Defendant Deputy Van Amburg, became more pronounced as she shook while clearly experiencing generalized seizures and/or exhibiting symptoms of focal onset aware seizures and/or focal onset impaired awareness seizures. Although Defendant Heather Ihrig and Defendant Deputy Van Amburg witnessed Tiffany Davis' serious medical conditions, the two chose to ignore the symptoms of a serious medical condition and simply diagnosed her as having the flu even though there was no testing completed for their diagnosis by Defendant Deputy Van Amburg, Defendant Heather Ihrig or Defendant Dr. Natole.

49.     Defendant Deputy Van Amburg also documented that he witnessed Tiffany Davis had vomited in a tote.

50.     As a result of the lack of medical treatment or emergency medical care, Keri Smith pled with Defendant Heather Ihrig and Defendant Deputy Van Amburg that Tiffany Davis was not a "faker" and to please get emergency help for her. Neither Defendant Deputy Van Amburg nor Defendant Heather Ihrig called for an ambulance or for any immediate emergency help.

51.     Defendant Heather Ihrig simply charted her medical report, which was ultimately transmitted to Defendant Dr. Natole providing him with the details as stated above of Tiffany Davis' serious medical condition.

52.     When presented with Defendant Heather Ihrig's medial chart, as indicated by his signature, Defendant Dr. Natole prescribed medication only for nausea and for head pain without ever seeing Tiffany Davis or completing a medical assessment of Tiffany Davis on February 18, 2020, or anytime thereafter. Defendant Dr. Natole never followed up on the status of Tiffany Davis, never physically assessed her, never ordered a treatment plan, never ordered a follow up examination, never ordered the appropriate laboratory testing, nor supervised his subordinates with communication effective to treat Tiffany Davis knowing that she exhibited symptoms of a serious medical need as he was informed of such by Defendant Heather Ihrig via her chart. Defendant Dr. Natole did not order emergency care for Tiffany Davis when he was told of her serious medical conditions by Defendant Heather Ihrig. Defendant Dr. Natole simply offered the same level of care that he offered his prior deceased in-custody "patient," Paul Bulthouse, which was only his deliberate indifference to a serious medical need.

53.     It was clear at this point that Tiffany Davis was experiencing a serious medical need, as evident by her having a seizure along with the many other symptoms of grave illness all while in the presence of Defendant Heather Ihrig and Defendant Deputy Van Amberg. Tiffany Davis was suffering from the life-threatening complications of an infection that would go completely untreated at the jail.

54.     Defendant Heather Ihrig told Keri Smith that Tiffany Davis could be taken down to an observation cell and that the medical staff would come back shortly for her to be transported. However, Tiffany Davis' condition worsened after Defendant Heather Ihrig and Defendant Deputy Van Amburg left her unattended in cell Q15 in the care of Keri Smith.

55.     Tiffany Davis continued to experience extreme head pain, could barely speak coherently and was experiencing a medical emergency for over 45 minutes. Keri Smith once again

pushed the emergency button in cell Q15 at approximately 9:50 a.m. pleading for emergency medical attention.

56.     Defendant Deputy Van Amburg documented that he received this second call for "a medical emergency." Instead of calling for an ambulance, Keri Smith was told by Defendant Deputy Van Amburg via intercom that medical would not be returning for Tiffany Davis as there was no space for her in the observation cell. Defendant Deputy Van Amburg chose to turn on the shower remotely so that Keri Smith could dispose of Tiffany Davis' vomit that had filled the inmate's tote. She then assisted Tiffany Davis into the shower to give her some relief from the fever. As Keri Smith was assisting Tiffany Davis in exiting the shower, Tiffany Davis had another seizure. Keri Smith hit the cell's emergency intercom button again and screamed for help and pled for the deputies to unlock the cell door due to the serious medical emergency.

57.     At this point in time, the video of the general area outside of cell Q15 shows other inmates being alarmed, observing the emergency situation from the outside of the locked Q15 cell door and attempting to get the attention of the deputies for help. Many of the inmates yelled for help and tried to get into the cell to assist Tiffany Davis.

58.     When the Q15 cell door finally opens, the video depicts Defendant David Lopez, LPN, and Defendant Danielle Carlson, RN, entering the cell along with Defendant Deputy Root. Keri Smith was in the cell holding Tiffany Davis due to her fragile state. Keri Smith observed Tiffany Davis engaging in yet another shaking seizure while Defendant David Lopez, LPN, and Defendant Danielle Carlson, are in the cell attending to her as Defendant Deputy Root watches Tiffany Davis from the cell door threshold.

59.     Keri Smith told Defendant David Lopez, LPN, Defendant Danielle Carlson, RN, and Defendant Deputy Root that Tiffany was having seizures. Keri Smith told Defendant David Lopez, LPN, Defendant Danielle Carlson, RN, and Defendant Deputy Root that Tiffany Davis

must immediately go to the hospital due to her serious medical condition explaining her many symptoms, however, this demand was once again ignored by all of them.

60.     Keri Smith observed Defendant David Lopez, LPN, Defendant Danielle Carlson, RN, and Defendant Deputy Root watch Tiffany Davis have a seizure in the Q15 cell and do nothing to assist her.

61.     Defendant David Lopez, LPN, charted that this encounter as an "emergency call" to cell Q15; that Tiffany Davis was on the "floor on a mat, naked with a blanket covering her; that he was told Tiffany Davis was having a seizure, that Tiffany Davis was on the "mat flailing arms and loudly complaining that 'it hurts so bad.'" Defendant David Lopez, LPN, further documented, "When questioned more, inmate seems to have difficulties taking directions and requires numerous verbal cues." These manifestations, along with his and Defendant Danielle Carlson's, RN, knowledge of Tiffany Davis experiencing seizures in their actual presence and the earlier seizures prior to their arrival, clearly exhibited a serious medical need. Yet they chose to be deliberately indifferent to Tiffany Davis and not call 911, not contact a doctor for a treatment plan or have her assessed by a doctor. Defendant David Lopez, LPN, chose in his supervisory capacity to once again do nothing to treat a serious medical condition of an inmate. Defendant Danielle Carlson, RN, who was a higher credentialed nurse, chose to do nothing to help Tiffany Davis.

62.     Notwithstanding Keri Smith witnessing Defendant David Lopez, LPN, watch Tiffany Davis have a seizure, Defendant David Lopez, LPN, chose to falsify his report and document that he did not actually see her suffer from a seizure while in the Q15 cell.

63.     Defendant, David Lopez, LPN, laughed after Keri Smith made the demand that Tiffany Davis be immediately taken to the hospital for the seizure and her decrepit state. Tiffany Davis was strapped to a restraining chair as the deputies and responding medical personnel made light of the emergency situation. Defendant David Lopez, LPN, turned to Keri Smith and made a

very strange jailhouse "joke" indicating that she now owed him "two packs of noodles" (in jest for his medical assistance).

64.     Defendant David Lopez, LPN, is the Health Services Administrator and/or the site Manager of the Medical Department of the Muskegon County Jail Health as an employee of Defendant Wellpath and he has confirmed his supervisory role as such in various interviews namely during the criminal investigation of this matter.  Defendant David Lopez, LPN, maintained the on-site supervisory role over all Defendant Wellpath nurses, emergency medical technicians and medical assistants employed at Muskegon County Jail at all times relevant to the events stated in this complaint.

65.     The video shows Tiffany Davis' head dangling to the side and her mouth open as she gazes off while being strapped in the chair and wheeled down the flight of stairs by Deputy Mosely.

66.     Defendant Danielle Carlson, RN, chose not to chart her Q15 cell observations, interactions, or assessment of Tiffany Davis, despite witnessing Tiffany Davis' seizure and being in the cell with her for an extended period of time. She was deliberately indifferent to Tiffany Davis' serious medical need by not obtaining any treatment for her despite the observed seizure, her symptoms of life-threatening medical crisis and the reports of earlier seizures etc.

67.     Tiffany Davis was taken to the HD6 holding cell which was occupied by one other female. The cell is under video surveillance. The cell consists of a steel bench, a toilet, and a sink. The video depicts Tiffany Davis being wheeled in by Defendant David Lopez, LPN, and Deputy Mosely while she is clearly in great discomfort, crying and nearly falling out of the chair onto the ground. She has no balance as she is disoriented and experiencing delirium. Both men must physically lift her out of the chair to put her on the thin blanket that they courteously placed on the hard cement floor for her to rest. Tiffany Davis crawls on her knees to the blanket on the cement

floor. Defendant David Lopez, LPN, then places a blanket over her like a wounded animal while she is in the fetal position clearly in pain as the symptoms of her medical emergency are profound. The video shows Tiffany Davis experiencing various involuntary muscle movements while lying on the ground for a number of minutes indicative of her seizure activity and/or decerebrate posturing due to her medical emergency that was ignored by all Defendants.

68.     Defendant David Lopez, LPN, returned with Defendant Deputy Smith to HD6 to take her vitals. It is clear in the video that Tiffany Davis is in agonizing pain as her vitals are taken as she lay on the cement floor. Upon completion, Defendant David Lopez, LPN, talks to her while she is in a state of delirium, holding her head with her hands and rolling the back of her head onto the wall to look at the opposite wall clearly experiencing focal onset seizure (versive seizure) activity and/or the decerebrate posturing and/or neurologic emergency while Defendant Deputy Smith is observing all from the doorway. Tiffany Davis is left on the floor writhing in pain again by Defendant David Lopez, LPN, and Defendant Deputy Smith, rocking back and forth and putting her head on the cement floor while experiencing the obvious emergency medical situation that once again went ignored for treatment.

69.     The video depicts Defendant David Lopez, LPN, return to the cell, and this time he must lift Tiffany Davis up off the floor for her to be taken to the bathroom. Tiffany Davis is completely without balance and nearly falls into the wall with all of her weight while Defendant Deputy Smith observes Tiffany Davis struggling and falling. She toppled over and reached for inanimate support while Defendant David Lopez, LPN, holds her up. Tiffany Davis is forced to use the toilet stall privacy wall to maintain balance to not fall back down. Because she is so ill, it took her nearly 3 minutes to get to the toilet stall, which was approximately 5 feet away, even with the assistance of Defendant David Lopez, LPN. Defendant David Lopez, LPN, had to unroll the toilet paper and hand a piece to Tiffany Davis as she was physically unable to complete the task

24

herself after providing the urine sample. After observing this abnormal behavior, Defendant David Lopez, LPN, inhumanely once again returns Tiffany Davis back to her blanket on the cement floor as she is agonizing in pain from the bacterial infection and the brain bleeds that are affecting her organs.

70.     The video shows Tiffany Davis in extreme pain and crying. Tiffany Davis pounds on the cell door for over 5 minutes trying to get the attention of any individual. Defendant Deputy Smith responds by going to HD6 and stands at the cell door window looking at Tiffany Davis as a spectator of her pain and discomfort. Defendant Deputy Smith does nothing to assist her as he deliberately ignores her need for emergency treatment despite his full observation of her serious medical condition worsening.

71.     The video depicts Defendant David Lopez, LPN, later returning to HD6 with Defendant Deputy Lane standing guard at the door to offer Tiffany Davis something to drink as she is finally able to sit on the steel bench with the other inmate.[3]  Defendant David Lopez, LPN, then sadistically commands and points at Tiffany Davis like an animal to get back down to the cement ground and closes the cell door.  Tiffany Davis continues to sit on the steel bench, but Defendant David Lopez, LPN, and Defendant Deputy Lane return to HD6 to once again continue in their cruel and unusual punishment by demanding that Tiffany Davis lie on the cement ground while she was clearly in a state of medical emergency and suffering.

72.     Defendant Deputy Lane and Defendant David Lopez, LPN, continue to order Tiffany Davis to go down to the cement floor. The video depicts Defendant Deputy Lane standing

---

[3] Defendant Deputy Lane is currently criminally charged with involuntary manslaughter in the case of *People of the State of Michigan v. Jamal Lane*, 14th Circuit Court Case number 2021-21004437-FH, for his alleged criminal conduct as it relates to the 2019 death of Muskegon County jail inmate, Paul Bulthouse, who died in his jail cell of status epilepticus, while various criminal defendants watched him suffer and deteriorate due to his serious medical condition and the lack of medical treatment thereof.

over Tiffany Davis in a very aggressive manner, apparently yelling at her and continuously pointing to the cement floor. Tiffany Davis is barely able to walk, uses the walls for balance and goes to the open cell door to talk to Defendant David Lopez, LPN, who points to the cement floor along with his sadistic teammate, Defendant Deputy Lane. Both men continuously order her to lie on the cement floor like an animal, thus advancing their cruel and unusual punishment tactics.

73.     For many hours, Tiffany Davis exhibits extreme discomfort, and the signs of her mental and physical deterioration were very evident as she was in the cell. She walks with no balance, uses the walls for balance and continues to exhibit obvious signs of a medical emergency and severe sickness. She lies on the floor in the fetal position, and when she is able to make it to the cell door, she pounds on it continuously at various times for help. She lies on the floor in an unnatural position with her head in the steel frame of the cell door and her legs extended out while she stares at the light with her head cocked back and as her jaw involuntarily moves exhibiting her critical neurological emergency. Tiffany Davis' neurological emergency occurs repetitively and over many hours while she lay on the floor with no help from Defendant Deputy Smith or Defendant Deputy Lane (or anybody else) as they were deliberately indifferent to her serious medical needs. Yet, Tiffany Davis continued to knock on the door for anyone to help her, but nobody answered.

74.     The two deputies, namely Defendant Deputy Smith and Defendant Deputy Lane, were assigned to watch the inmates in the observation cells, including Tiffany Davis' HD6 cell, via a live video feed to a monitor on their desk. Unfortunately, both deputies chose not to watch the monitor against jail policy. Normally, there are three deputies assigned to such tasks at the desk with one deputy that is supposed to be constantly watching the live observation cell video feed monitor. In this instance, Defendant Muskegon County chose to violate its own policies by not having a third deputy specifically assigned be designated to only monitor the live video feed of the

26

so called and designated "observation cells." Defendant Deputy Smith and Defendant Deputy Lane were deliberately indifferent to Tiffany Davis' serious medical needs, by not offering emergency medical help as her symptoms of a medical emergency worsened after she was assessed by the medical personnel. Not only did both deputies choose to ignore their own personal observations of Tiffany Davis' worsening medical emergency in HD6, but they chose not to watch the monitor's live video feed of her cell as another method of being deliberately indifferent to her needs.

75.     Tiffany Davis is finally met many hours later at approximately at 2:30 p.m. by Defendant David Lopez, LPN, in HD6 along with Defendant Danielle Carlson, RN, and Defendant Deputy Smith. Defendant David Lopez, LPN, engages with Tiffany Davis at the cell door as she heavily leans on the steel door frame as he appears to be taking her vitals. Tiffany Davis then sat on the bench while Danielle Carlson, RN, completes a medical assessment of the other unknown cell inmate. The video depicts Tiffany Davis talking to Defendant Danielle Carlson, RN, as she is in distress and holding her head. Defendant Deputy Smith once again observes the interaction with Tiffany Davis from the cell door area.

76.     Defendant Danielle Carlson, RN, later charted the following of the interaction at 3:38 p.m., "Inmate cleared by D. Lopez LPN to return to gen pop after observation. Inmate vitals as follows 98.3 138/90 pulse of 118. Inmate reports feeling better. Although still complains of headache." Defendant David Lopez, LPN, did not chart this interaction or his conclusions for "clearing" Tiffany Davis to be removed from HD6. Defendant Danielle Carlson, RN, and Defendant David Lopez, LPN, together allowed Tiffany Davis to be returned to the Q15 cell, which was knowingly unmonitored, despite not receiving any order from a doctor and despite their continued observations of all of her serious emergency medical needs that continued and were undoubtedly getting worse. All of the individuals in the booking area who had contact with Tiffany Davis in HD6, including but not limited to Defendant David Lopez, LPN, Defendant Danielle

Carlson, RN, Defendant Deputy Smith, and Defendant Deputy Lane were all deliberately indifferent to Tiffany Davis' rapidly worsening serious medical needs by not seeking emergency care, allowing her to continue in severe pain without treatment and allowing her to return with no medical care or plan of care to cell Q15.

77.     There is a progress note, presumably by Defendant David Lopez, LPN, indicating that Tiffany Davis' vitals were charted from his earlier encounter on February 18, 2020, at 10:28 a.m., indicating blood pressure of 151/97, a pulse of 105, a respiratory rate of 18 and temperature of 99.6.

78.     Defendant David Lopez, LPN, combined his charting by including his first morning Q15 cell encounter with Tiffany Davis and his first encounter in HD6. He utilized the SOAP (subjective, objective, assessment, and plan) method of reporting. Under "S" he indicated "emergency call to Q pod." Under "O" he stated "responded to call to Q pod. Inmate on floor on a mat, naked with a blanket covering her. Roommate assisted Davis out of the shower. Roommate states Davis began having a 'seizure' (not witnessed by this nurse). Davis on mat flailing arms and loudly complaining of 'it hurts so bad.' When questioned more, inmate states that her head hurts and points to her forehead just above the brow. Emesis of probable food materials is noted in a property bin. Inmate states that she has not felt well since this AM. Inmate seems to have difficulties taking directions and requires numerous verbal cues. Inmate was dressed by this nurse and another female nurse. Brought to HD with assist of 2 deputies and the stair chair. Inmate is alert and oriented x3. Obtained urine specimen. Urine is amber in color, strong odor. Chemstrip is unremarkable, 12 panel urine drug screen is unremarkable. Urine pregnancy test is negative. Pupils seem larger than normal for lighting conditions. Inmate had a large, formed BM also after submitting a urine specimen." Under "A" he indicated "Alt comfort." Under "P" he indicated "given motrin 600mg, Tylenol 650mg PO x 1." Under "E" he stated "rest, take meds, remain in

holding until issue resolves." Defendant David Lopez, LPN, also told the investigating officers, as more fully described below, that this was an acute situation with Tiffany Davis as there was no indication that she self-inflicted injury or was involved in some type of trauma/accident/assault. Despite there being no trauma to Tiffany Davis' head, there is no charting that he requested emergency medical assistance, consulted with Dr. Natole or any other doctor, or requested a simple blood lab test that undoubtedly would have revealed the bacterial infection in her body. Once again, as in the Paul Bulthouse matter, Defendant David Lopez, LPN, was deliberately indifferent to an inmate's serious medical needs evident by his very own words in his assessment in this case: "rest, take meds, remain in holding until issue resolves." Defendant David Lopez, LPN, chose to do nothing but observe a dying inmate suffer on the floor of a cage. He again ignored every indication of an inmate suffering from a serious medical need by simply becoming a spectator as he waited for the "issue" to resolve and offered no treatment.

79.     Tiffany Davis exited HD6 with Defendant Deputy Van Amburg. She lost her balance numerous times falling into the wall outside of HD6 as Defendant Deputy Van Amburg walked aimlessly out of her reach. She can be observed holding her head while walking in front of Defendant Deputy Van Amburg. Tiffany Davis returned to general population, cell Q15, as she was inexplicably cleared by Defendant David Lopez, LPN, and also cleared by the higher credentialed Defendant Danielle Carlson, RN, despite her obvious serious medical needs.

80.     Tiffany Davis returned to her cell at approximately 2:45 p.m. escorted from HD6 by Defendant Deputy Van Amburg to the Q pod lower general area. There was no medical personnel with her, nor were there any medical orders for immediate treatment or continued/follow up care from any medical personnel. She was not seen by Defendant Dr. Natole or any other doctor and she was not taken to an emergency room despite her serious medical conditions. She is abandoned by Defendant Deputy Van Amburg as she is left alone to climb up the long stretch of

stairs to Q15. She almost fell down the stairs as her balance was extremely limited due to her severe sickness. The video depicts Tiffany Davis struggling to balance and nearly falling as Keri Smith heroically exits their cell to assist her to get up the treacherous flight of stairs into the cell.

81.     While in Q15, her condition worsened as witnessed by Keri Smith. Tiffany Davis continued to lay in the bunk for hours moaning with pain and experiencing long gazes up at the light with a very blank look all while exhibiting focal onset seizures as she did in HD6 and earlier in the cell. Keri Smith left the cell and returned to cell Q15 to find Tiffany Davis on the floor of the shower. She yelled for help and inmate Kendra Calkins assisted her with Tiffany Davis, who was actively experiencing a seizure. They hit the emergency button and yelled to the responding deputy, Defendant Deputy Temple, that Tiffany Davis was having another seizure. Defendant Deputy Temple indicated in her report, "inmate stated that Tiffany was having another seizure and we needed to get a nurse up there to help."

82.     Defendant Deputy Temple entered cell Q15 and observed Tiffany Davis experiencing a serious medical need. Defendant Deputy Temple is in the cell with Keri Smith and Kendra Calkins, who are caring for Tiffany Davis for about 7 minutes, yet she still does not seek emergency medical help for her at that point.

83.     At approximately 6:52 p.m. Defendant Carleen Blanch, RN, Defendant Britni Brinkman, EMT, and Defendant Deputy Schubert responded to cell Q15 as Keri Smith and Kendra Calkins were attending to Tiffany Davis while she lay on the ground. Tiffany Davis' arms continued to have involuntary movement while she was actively having a seizure in their presence. Defendant Britni Brinkman, EMT, aggressively yelled at Tiffany Davis to stop moving her arms as if she had any ability to stop the involuntary movement during the seizure. As Kendra Calkins held Tiffany Davis' head, she yelled back at Defendant Britni Brinkman, EMT, and Defendant Carleen Blanch, RN, Defendant Deputy Temple and Defendant Deputy Schubert that Tiffany

30

Davis could not help her arms from moving like that as she had no control over the movement due to her having a seizure and further explaining that should be obvious to all of them.

84.     Defendant Carleen Blanche, RN, Defendant Britni Brinkman, EMT, Keri Smith, Kendra Calkins, Defendant Deputy Temple, and Defendant Deputy Schubert all watched Tiffany Davis experience a seizure while she was lying on the floor. Kendra Calkins was then kicked out of cell Q15 by the responding team due to her demands that they provide Tiffany Davis with immediate emergency care.

85.     Keri Smith told Defendant Carleen Blanche, RN, Defendant Britni Brinkman, EMT, Defendant Deputy Temple, and Defendant Deputy Schubert that Tiffany Davis had to immediately go to the hospital to which Defendant Carleen Blanch, RN, responded, "She's going to be ok. It's my call." Keri Smith pleaded again to Defendant Carleen Blanche, RN, that Tiffany Davis needed to go to the hospital to which Defendant Carleen Blanche, RN, aggressively responded, "She isn't going to the hospital" exhibiting her deliberate indifference to Tiffany Davis' serious medical needs.

86.     Defendant Carleen Blanch, RN, executed a handwritten progress note for her encounter with Tiffany Davis in cell Q15. She indicated under the header entitled Problem, "I'm having a seizure." The date and time are charted as 2/18/2020 at 1840 hours. She indicated under the header entitled Notes, "Medical called to Q15 for a possible seizure. Upon arrival inmate is sitting on the floor – post shower shaking throughout her body. She is alert & speaking lucid statements yet refusing to answer assessment questions – acting perplexed and confused yet saying 'Fuck' over & over. Vitals 153/84, HR 116. Pupils equal & reactive yet quite dilated. She complains of a severe HA – onset today in Frontal Area. She will not answer questions to determine anything. Inmate assisted to stand and she walks freely as she is escorted to holding for

observation."[4] Despite the observation of Tiffany Davis' seizure in Q15, the worsening symptoms of a neurological medical emergency, the earlier reports of seizures, as well as many other symptoms such as fever and vomiting, Defendant Carleen Blanch, RN, and Defendant Britni Brinkman, EMT, both chose not to send Tiffany Davis to the hospital for emergency care or even consult with a doctor. They chose again, like they personally did in the Paul Bulthouse matter leading up to his death from seizures, to be deliberately indifferent to her obvious and serious medical needs.

87.     Despite the personal observation of Tiffany Davis' seizure in Q15, the reported and charted history of seizures from the morning of February 18, 2020, by the other deputy and medical defendants who witnessed Tiffany Davis' serious medical condition, and her worsening deterioration from her earlier medical contacts, Defendant Deputy Temple and Defendant Deputy Schubert both chose not to address the need for emergency care and call 911 or seek alternative medical treatment, despite the lack of care she was receiving from the responding medical staff, and were deliberately indifferent to her serious medical needs.

88.     Defendant Carleen Blanche, RN, indicated during her interview to the investigating officers that when she arrived for her shift she was told by Defendant Danielle Carlson, RN, that "Tiffany's trying to get to the hospital for some reason or whatever." This statement clearly indicated that the general belief that Tiffany Davis was being a malingerer and/or factitious as to her symptoms in an effort to get out of the jail.

89.     Defendant Carleen Blanche, RN, also confirmed with the investigating officers that when she first arrived at Q15 she was specifically told that Tiffany Davis had been "having seizures," that she observed Tiffany Davis to have unusually more dilated pupils, that she was

---

[4] Upon information and belief, "HA" is a shorthand medical abbreviation for the term "head ache."

saying "fuck" and "fuck my head hurts," that Tiffany Davis could not answer her questions, that she was "off kilter," that she "one minute would make a sentence that was clear and the next minute just say "fuck—my head," and that the inmate bunkmate told her that Tiffany Davis had to go to the hospital. She further explained that Tiffany Davis was at times unresponsive to her questioning. Defendant Carleen Blanche's, RN, statements confirmed to the investigating officers that she was clearly aware of Tiffany Davis' serious medical needs.

90.     Instead of allowing Tiffany Davis to go to the hospital, Defendant Carleen Blanche, RN, and Defendant Britni Brinkman, EMT, escorted her from cell Q15 to the medical examination room which was on a different floor of the jail. The video depicts Tiffany Davis not having stable balance as Defendant Deputy Schubert had to stabilize her from falling. There is no charting by either Defendant Carleen Blanche, RN, or Britni Brinkman, EMT, as to their medical assessment (approximately 3 minutes from 7:02 p.m. – 7:05 p.m.) with Tiffany Davis in the medical examination room. However, Defendant Carleen Blanche, RN, noted that she collected a urinalysis at 6:50 p.m. and the results came back at 7:00 p.m. The urinalysis indicated that Tiffany Davis' urine was orange and appeared with sediment; protein was +30; trace keytones; elevated bilirubin; negative pregnancy; and negative for controlled substances. Once again, Defendant Carleen Blanche, RN, Britni Brinkman, EMT, and Defendant Deputy Schubert were deliberately indifferent to Tiffany Davis' serious medical needs by doing nothing to help her even when presented with additional facts provided by the completely abnormal urinalysis along with her continuous symptoms that required emergency care.

91.     The National Institute of Health states that commonly during sepsis, increased bilirubin levels are a late event in the course of multiorgan dysfunction. Notwithstanding the elevated bilirubin, the many manifested physical symptoms of a serious medical condition as stated above, the perceived agony and pain that Tiffany Davis was in, the observed seizure and the inmate

33

and deputy reports of earlier sustained seizures, and the request from at least three people requesting Tiffany Davis to be taken to the hospital for emergency care, Defendant Carleen Blanch, RN, chose to not consult with a doctor or to send her to the hospital. She instead chose the same path as her boss, Defendant David Lopez, LPN, which was to be deliberately indifferent and to follow Defendant Muskegon County and Defendant Wellpath's custom and policy in dealing with inmates who suffer from such serious medical conditions, ie. seizures, which was to wait and do nothing but observe. Her deliberate indifference is illustrated by her very own statement to inmate, Keri Smith, when she stated, "She isn't going to the hospital."

92.     The video shows that at 7:06 p.m. Tiffany Davis was taken into cell HD8 to be housed with an overly crowded group of females that were likely pending the intake/booking process. There is nowhere for her to sit or lie down so she crawls into a corner and lies down once again on the cement floor with her blanket.

93.     For the next 35 minutes one can periodically observe Tiffany Davis' legs sticking out from the area of the cement floor where she was lying down and observe her leg/foot exhibit various seizure/shaking activity and/or decerebrate posturing and/or involuntary movement. While Tiffany Davis is lying on the cement floor, one can see that there is another inmate who appears to be having a seizure and the medical personnel enter HD8 due to the inmates screaming and pounding on the glass to get the attention of the deputies / medical staff who were supposedly watching the live video feed. The sick inmate is clearly convulsing in a bunk. The inmates, including Tiffany Davis, who is very unbalanced and the last to exit the cell, leave HD8 and are directed to HD6. At no point during the medical evaluation of the seizing inmate in HD8 was Tiffany Davis ever medically assessed by the responding medical staff. While in HD6 with the other inmates, Tiffany Davis is very disoriented and lacks balance as she puts her head into her hands. Tiffany Davis and the crew of inmates were then returned to HD8. While back in HD8, the

same sick inmate experienced yet another medical emergency and what appears to be another seizure due to her convulsing to which the medical staff were called back into the cell. Tiffany Davis and the inmates were again moved to HD6. It is clear in the video that she is very disheveled, disoriented and lacks balance.

94.     The inmates are all escorted out of the HD6 for a second time at approximately 8:00 p.m. except for Tiffany Davis and one other inmate that was already housed in HD6. Tiffany Davis is extremely disheveled, disoriented and nearly falls with no balance at the 8:13 p.m. time mark. She struggles to place her body on the small steel bench in HD6 that is completely occupied by the outstretched inmate, the only respite from the hard cement floor. Tiffany Davis is forced to lie on the cement floor as there is no room on the steel bench. She once again lies down with her blanket on the cement floor in the fetal position, in complete distress as her body continues to feel the effects of the bacterial infection and her brain feels the effects of the bleeding. The video shows Tiffany Davis sitting against the wall rocking back and forth while experiencing jerking, twitching, tremors, and spasms for great lengths of time. She exhibits obvious decerebrate posturing, constant repetitive movements / rocking, along with long unblinking stares as she experiences hours of seizure like activity and neurological crises. She also exhibits irrational behavior by removing all of her clothing and remaining naked.

95.     It is not until 9:40 p.m. that Tiffany Davis is finally seen again by medical personnel, Defendant Carleen Blanche, RN, for a total of approximately 3 minutes, accompanied by Defendant Deputy Schubert. Defendant Carleen Blanche, RN, noted at 2100 hrs: "Checked on inmate. U/A done +protien [sic] trace keytones [sic] & bilirubin. Vitals 140/94 HR 111. Observed inmate and she is walking around easily with no clothes on except a blanket around her. Temp 98.8 oral. She then starts shaking when nurse call her to door. She becomes argumentative and aggressive with profanity when told that I don't feel she needs an ER visit. CB."

96.     Yet again, Defendant Carleen Blanche, RN documents her very own deliberate indifference to Tiffany Davis' serious medical needs. Despite all of the following information and observations by Defendant Carleen Blanche, RN, the earlier documentation of Tiffany Davis' failing health in the medical charting, her observed neurological crises in various cells, her knowledge of the reported multiple seizures by various people, her personal observations of an active seizure, the prominent decerebrate posturing that occurred during the assessments or while in the cells, the knowledge of vomiting and fever, the knowledge of the problematic urine analysis findings with elevated bilirubin, the perceived unusual behavior / delirium, the perceived long glazed-over stares, abnormal pupil dilation, the mental unresponsiveness / aggressive tone / the inability to effectively communicate, the specific dire pleadings directly to her for Tiffany Davis to be taken to the emergency room by the inmates caring for her in Q15 and by Tiffany Davis' very own request while in HD6, and the clear observation of the continuing decline in her overall health, Defendant Carleen Blanche, RN, continued to be deliberately indifferent to her serious medical needs as she specifically declined to send Tiffany Davis to obtain emergency medical treatment. Her very own declaration with her own signed initials of the medical chart entry stating, "I don't feel she needs an ER visit. CB" is nothing more than absolute. Defendant Carleen Blanche, RN, deliberately made a choice to not send her to the hospital and to not even call a doctor. Defendant Carleen Blanche, RN, did not order that Tiffany Davis be given emergency care at a hospital, she did not order subordinates or the next midnight medical personnel shift to address Tiffany Davis' serious medical needs, nor did she ask for / or prescribe a follow up plan to care for her. Defendant Carleen Blanche, RN, simply ignored the serious medical condition that was blatant and allowed Tiffany Davis to continue to suffer while her brain and other organs failed. As described in detail below, Defendant Carleen Blanche, RN, did affirmatively take one action and

that was to threaten Gracie Michael with criminal charges during the phone call when she demanded that her daughter, Tiffany Davis, be sent to the hospital for her serious medical needs.

97.    Defendant Deputy Schubert also continued her mission from the earlier hours in the day of being deliberately indifferent to Tiffany Davis' serious medical needs into the evening on February 18, 2020, as she observed her worsening condition and did nothing to assist, even while witnessing the failure of all of the medical staff, notably Defendant Carleen Blanche, RN, to offer medical assistance to her. Defendant Deputy Schubert reported that after Defendant Carleen Blanche, RN, observed Tiffany at approximately 9:40 p.m., "I told her to put her clothes on several times, as she only had a blanket wrapped around her, and she didn't listen so I just closed the door after they were done checking her out." Per the usual custom, Defendant Deputy Schubert did nothing to assist Tiffany Davis with her serious medical need other than to "just close the door" despite witnessing her condition worsen and the medical staff offering no help to her.

98.    Defendant Carleen Blanche, RN, however, did give Tiffany Davis a small amount of fluid to drink after her three-minute assessment. Over the next two hours, Tiffany Davis continued to experience a delusional state while she is naked, in extreme discomfort, crying, exhibiting decerebrate posturing, covering her eyes from the light, going to the cell door for help and rocking against the cell wall exhibiting signs of an emergency neurological condition until she is later moved from HD6 in the early hours of February 19, 2020. At approximately 11:38 p.m. the video depicts Tiffany Davis, who has been awake for nearly 20 straight hours with barely any intake of food or water, in agonizing pain rocking methodically while naked with a blanket then eventually covering her eyes from the light with her head against the cement wall all due to her serious medical need. At approximately 11:39 p.m. Tiffany Davis again depicts seizure like activity / decerebrate posturing as her foot shakes repetitively while she sits on the steel bench. As

described below, the video does not show Defendant Carleen Blanche, RN, _ever_ seeing Tiffany Davis again after her 9:40 p.m. visit on February 18, 2020.

99.     Defendant Carleen Blanche, RN, spoke to Tiffany Davis' mother, Gracie Michael, on February 18, 2020, after 7:00 p.m. as confirmed by Deputy Sgt. Meyers' report who documented that he transferred the initial call to the medical unit. Gracie Michael, who was scheduled to have a video visit with Tiffany Davis on February 18, 2020, was told by inmate, Shelby Smith, who intervened in the video call, that Tiffany Davis was taken down earlier in the day to the medical unit, that she was experiencing seizures and that she needed to go to the hospital. A review of the recorded audio calls illustrate that inmate Shelby Smith told Gracie Michael to seek immediate help for her daughter. Gracie Michael told the first answering medical personnel individual in the medical unit that she knew her daughter was in the medical unit with seizures and reported that she has no history of seizures. Gracie Michael was told that the matter would be looked into and that she would receive a call back regarding Tiffany Davis. After waiting for over an hour and no returned call, Gracie Michael called the medical unit again and spoke to Defendant Carleen Blanche, RN. Gracie Michael was told by Defendant Carleen Blanche, RN, that "they don't return calls" and that "we are well equipped to take care of our inmates in our infirmary." Gracie Michael demanded to Defendant Carleen Blanche, RN, that her daughter be immediately taken to the hospital. Defendant Carleen Blanche, RN, reiterated that jailers are cared for at the jail "not the hospital." Defendant Carleen Blanche, RN, then escalated the situation with an abuse of her power by threatening criminal charges against Gracie Michael and hung up on her. Gracie Michael then called 911 out of desperation to get help to her daughter and once again her plea for help was ignored even by the 911 dispatcher. Defendant Carleen Blanche, RN, was deliberately indifferent to Tiffany Davis' serious medical need as illustrated by her ignoring Gracie Michael's plea for emergency care.

100.    Upon information and belief, Defendant Carleen Blanche, RN, arguably committed multiple crimes by lying in her medical charting and by lying to the investigating officers in stating that she personally assessed Tiffany Davis on February 19, 2020, at 12:10 a.m. Her handwritten medical charting indicates that she wrote "2/19/20 0010" under the date and time category; under the notes header she handwrote, "Inmate checked on, she remains arguementive [sic] with medical staff. Vitals 144/96 HR 109 Temp 98.2. She will remain in holding through the night.----------C. Blanche RN---" However, on February 18, 2020, the booking area camera recording depicts the entrance into HD6 showing Defendant Carleen Blanche, RN, entering HD6 to see Tiffany Davis with Defendant Deputy Schubert at her side from 9:40-9:43 p.m. The video recording continuously records the exterior of the cell door and the very next encounter at HD6 is at 11:49-11:50 p.m. where Defendant Sara Bruce, EMT, and Defendant Britni Brinkman, EMT, watch Tiffany Davis in the cell window and walk away doing nothing to assist her once again. The only other recording of an encounter at HD6 occurs on February 19, 2020, from approximately 12:10-12:12 a.m. where Defendant Sara Bruce, EMT, Defendant Britni Brinkman, EMT, and Defendant Deputy Schubert open the cell door of HD6. They speak to the other inmate in HD6 then talk to Tiffany Davis and simply only offer her liquid. Defendant Sara Bruce, EMT and Defendant Britni Brinkman, EMT, never charted any assessment for their two encounters with Tiffany Davis on the February 18-19, 2020, midnight shift. Thus, the video recording of the booking area depicting the entrance to HD6 and the camera recording from inside of HD6 never shows Defendant, Carleen Blanche, RN, having any contact with Tiffany after she completed her encounter with her on February 18, 2020, at 9:40-9:43 p.m.

101.    Defendant Carleen Blanche, RN, furthered her lies by verbally confirming with the investigating officers numerous times during her interview that she personally assessed Tiffany Davis at least "4 times" including her last assessment being at "ten minutes after midnight" since

she stated that she left her shift at 12:30 a.m. As stated above, the video shows no such event. She also lied by documenting in her chart that she assessed Tiffany Davis at 12:10 a.m. Once again, there was no assessment by Defendant Carleen Blanche, RN, at 12:10 a.m. as her last assessment was at 9:43 p.m. the day prior. She also did not assess Tiffany Davis 4 times as she adamantly stated to the investigating officers. Her lies in her medical report corroborated by her lies to the investigating officers are arguably a State of Michigan felony crime under MCL 750.492a(1)(a) (Placing Misleading or Inaccurate Information in Medical Records or Charts), a federal crime under Health Care Fraud 18 USC §1347 and a crime under the Federal False Claims Act 31 USC §3729. However, Defendant Sheriff Poulin's friendly criminal investigators chose not to seek charges against Defendant Carleen Blanche, RN, for such conduct nor for her ratified deliberate indifference to Tiffany Davis' serious medical needs likely due to her opinion that the deputies did nothing wrong in this matter.

102.    Defendant Carleen Blanche, RN, also never charted her many Glasgow Coma scorings that she later claimed she conducted on Tiffany Davis when interviewed by the criminal investigators.[5] Although nowhere to be found in any of her contemporaneous charting, Defendant Carleen Blanche, RN, told the criminal investigators that Tiffany Davis' Glasgow Coma scores were in the normal range. This soring that was never documented was clearly an assertion to try to insulate herself from any criminal conduct and liability. As Defendant, Carleen Blanche, RN, explicitly stated to the investigating officers, "…if you didn't chart it, it didn't happen. So, whether you checked on her or not, doesn't matter. If you didn't chart and you have nothing to say about it – it did not exist." Defendant Carleen Blanche's, RN, medical charting offers no Glasgow Coma

---

[5] The Glasgow Coma Scale is used to objectively describe the extent of impaired consciousness in all types of acute medical and trauma patients. The scale assesses patients according to three aspects of responsiveness: eye opening, motor, and verbal responses.

scorings, therefore, under her very own explanation the scoring did not happen. She further stated, "And that is classic in nursing. They hammer us, if you didn't chart it, you didn't do it."

103.     However, one truth that Defendant Carleen Blanche, RN, told the investigating officers was when she admitted that "maybe I should've sent her" to the ER. The second truth stated by Defendant Carleen Blanche, RN, occurred when she admitted that the subsequent lack of care by the next midnight shift and next morning day shift crew, which was for approximately the next 15 hours, all contributed to Tiffany Davis' death by their own lack of medical care.

104.     During the midnight shift the only on duty medical staff, Defendant Sara Bruce, EMT, and Defendant Britni Brinkman, EMT, once again ignored an inmate, who was experiencing seizures and a neurological emergency, as each of them did in the Paul Bulthouse matter, by not checking on Tiffany Davis again after the minimal encounter at 12:10 a.m. or obtaining medical treatment for her serious medical needs. They again chose to be deliberately indifferent to her serious medical needs by doing nothing despite her being in a medical observation cell, their knowledge of her many neurological issues, and the obvious symptoms of her grave illness as charted by the previous shifts and their own observations.

105.     Tiffany Davis remained in HD6 until approximately 12:16 a.m. on February 19, 2020, whereupon she was taken to HD11 by Defendant Deputy Schubert and Deputy DeRooy. After being awake for nearly 24 hours, she is finally given a place other than just directly on the cement to lie her head. She is now given a very small thin mat to lay on the cement floor. For many hours throughout the night, Tiffany Davis is observed on the video recording to again be stricken with seizure like activity / decerebrate posturing as she stares directly at the light in her cell for long periods of time with extremely wide, unblinking eyes. She holds her head in pain and also tries to block the light from her eyes. In the morning hours one can see Tiffany Davis arching her back and rolling her head back with her body tensed indicative of a serious medical / neurological

issue need. Once again, the midnight medical crew of Defendant Sara Bruce, EMT, and Defendant Britni Brinkman, EMT, ignored Tiffany Davis' serious medical needs.

106. At approximately 8:00 a.m., Tiffany Davis is finally seen by Defendant Deputy Ahrens, Defendant David Lopez, LPN, and Defendant Jessica Fairbanks, LPN, for approximately 3 minutes as she is lying on the mat on the cement floor, and clearly medically / neurologically deteriorating. She is not seen by a doctor or a registered nurse. She is holding her head and is not responsive as her condition has greatly worsened. Defendant Jessica Fairbanks, LPN, chose not to chart her own assessment of Tiffany Davis. Only Defendant David Lopez, LPN, charted the encounter. Defendant David Lopez, LPN, charted the following information regarding this visit: "Seen in HD11. Lying on L side, eyes open, pupils appear larger than normal for lighting conditions. Still has c/o frontal lobe head pain. Answer questions appropriately. Denies any body aches or pains, states she has N/V and dizziness, seems to experience dizziness upon arising (based on verbal exclamations of 'whoa whoa whoa.'"[6] He further noted that her blood pressure was 114/76, pulse was 111, respiratory rate was 14 and her temperature was 99.2. Instead of offering medical treatment, notifying a higher level of medical professional, or taking her to the hospital, Defendant David Lopez, LPN, and Defendant Jessica Fairbanks, LPN, only offered Tiffany some liquid to drink. Although armed with all of the personal observations of Tiffany Davis' medical and neurological emergency crises, her continuing and worsening her serious medical conditions as evidenced by her obvious symptoms, her urinalysis, and the numerous requests for emergency help from multiple inmates and Tiffany Davis, Defendants David Lopez, LPN, and Jessica Fairbanks, LPN, chose yet again to not seek advanced medical care / treatment or send her to the

---

[6] Upon information and belief, "c/o" is a shorthand medical abbreviation for the term "complains of;" "N/V" is a shorthand medical abbreviation for the terms "nausea and vomiting."

emergency room, and instead again chose to continue to be deliberately indifferent to her serious medical needs by once again doing nothing.

107.     Defendant Deputy Ahrens, who was working the 6:30 a.m. shift, documented in her report that she was advised that Tiffany Davis was "brought down and placed in holding cell 11, due to having had a possible seizure." Defendant Deputy Ahrens is the officer who is assigned to watch the cells via the live video feed to the monitor at the booking area. The camera recording from HD11 for many hours shows that on February 19, 2020, Tiffany Davis experienced seizure like activity with extremely long gazes with rapid eye movement and Defendant Deputy Ahrens not seeking emergency medical help. As captured by the video recording, to which Defendant Deputy Ahrens is watching live, Tiffany Davis' catatonic state is clear as she lies on the floor during these seizures and/or decerebrate posturing episodes. Her jaw involuntarily clenches numerous times, her foot twitches and she is clearly in pain. As she crawled toward the food tray that was left for her, she fell back in pain. She eventually is successful in eating one bite of bread but succumbs to her anguish and serious medical needs. Tiffany Davis moaned in such excruciating pain that booking officer Defendant Deputy Ahrens comes into the cell at approximately 12:24 p.m., six hours after Tiffany Davis has been exhibiting clear symptoms of being in a medical crisis. The video shows Defendant Deputy Ahrens observing Tiffany Davis experiencing decerebrate posturing as her jaw clenches open and close and her back is unnaturally arched. Defendant Deputy Ahrens further documented that she called medical due to her observations that Tiffany Davis was "making moaning sounds and moving around," which was clearly an indication that she was suffering in pain and was continuing to experience a serious medical need. Despite witnessing Tiffany Davis later not receive any meaningful medical treatment and seeing her condition worsen, Defendant Deputy Ahrens was deliberately indifferent

to Tiffany Davis' serious medical needs by not obtaining an alternative higher level of medical treatment or calling for an ambulance to transport her to the emergency room.

108.    Defendant Jessica Fairbanks, LPN, and Defendant David Lopez, LPN, once again responded at approximately 12:24 p.m. and conducted an approximately 3-minute assessment of Tiffany Davis. Only Defendant Jessica Fairbanks, LPN, charted a progress note this time, two hours after the assessment, indicating: "Booking officer request medical to HD11 to assess inmate who had begun consistently groaning as she lay in cell. Upon arrival to cell, inmate continued groaning and occasionally muttering profanity but was able to answer questions r/t person and place. Inmate was repeatedly asked to describe what was going on or what was causing her a problem, and aside from answering once 'I don't know,' inmate did not answer questions from medical. BP 107/78 P 101 R 16. PERRLA but moderately dilated. Inmate did indicate that she would like a liquid diet x 24 hr. Will continue to monitor." Once again, Tiffany Davis' health was consistently worsening and deteriorating since her first encounter with Defendant Medical Personnel, yet no one sought advanced or emergency medical care for her. She continued to lie naked on the floor with decerebrate posturing, holding her head experiencing seizure activity for hours, or in a visible catatonic state while her body was contorting into various abnormal positions. It was obvious to a layperson that Tiffany Davis was experiencing a serious medical need that required immediate medical treatment as her body was completely shutting down due to the worsening sepsis and brain bleeds. Once again, although armed with all of their personal observations of the medical and neurological emergency crisis symptoms (ie. seizures, decerebrate posturing etc.) and the numerous requests for emergency care, Defendant David Lopez, LPN, and Defendant Jessica Fairbanks, LPN, do not seek advanced medical care / treatment or send her to the emergency room while they further continued to be deliberately indifferent to Tiffany Davis' serious medical needs. As stated by Defendant Jessica Fairbanks, LPN, they "will continue to

monitor." This course of "monitoring" and "treatment" that Defendant Medical Personnel and Defendant Deputies follow for many days for an inmate such as Tiffany Davis, who is gravely sick, is essentially a plan to simply allow an inmate to either be sick on their death bed until they either die, be taken to a hospital when the condition is irreversible, or to somehow be magically cured with inadequate or no medical treatment.

109.    For nearly two more hours, Tiffany Davis continues to be ignored by Defendant Deputy Ahrens, Defendant David Lopez, LPN, and Defendant Jessica Fairbanks, LPN, as her body is fully exhibiting signs of her grave illness. Deputy Ahrens goes back into HD11 at approximately 2:43 p.m. and noted in her report that Tiffany Davis was "hot" as she was clearly deteriorating even further from her serious medical condition, and nothing was being done to treat it.  Despite Tiffany Davis not receiving any meaningful medical treatment and seeing her condition worsen, Defendant Deputy Ahrens again was deliberately indifferent to Tiffany Davis' serious medical needs by not obtaining an alternative higher level of medical treatment as her condition is worsening or calling for an ambulance to transport her to the emergency room.

110.    For hours Tiffany Davis continued to twitch and stare with open eyes in a trance-like state while her body experienced episodes of decerebrate posturing due to the medical crisis that she endured for nearly two days with no medical treatment. The video depicts her body stiffen, her back arching, her jaw involuntarily clenching and her foot twitching. She stares with wide eyes at light without moving her body. Yet, Defendant Deputy Ahrens, who is tasked to watch the live video feed, does not seek emergency medical treatment or a higher level of treatment that is being offered by the responding medical staff. The video depicts that at approximately 3:09 p.m., Defendant David Lopez, LPN and Defendant Katy Castillo, LPN, arrived in HD11 and completed their medical assessment which lasted less than 2 minutes. Defendant Katy Castillo, LPN, covered Tiffany Davis with a blanket while Defendant David Lopez, LPN, searched her clothing.

Defendant David Lopez, LPN, watched as Defendant Katy Castillo, LPN, talked to Tiffany Davis, examined her pupils, and touched her head. Neither Defendant David Lopez, LPN, or Defendant Katy Castillo, LPN, charted their findings for this visit. Defendant David Lopez, LPN and Defendant Katy Castillo, LPN, were deliberately indifferent to Tiffany Davis' serious medical needs by not seeking emergency medical help despite seeing the decrepit state she was in at this point.

111.    At approximately 4:22 p.m., however, Defendant Jessica Fairbanks, LPN, charted the following in a progress note: "Inmate assessed again approx. 1500, response capability appears to be declining, though she did respond to pain stimuli, she was no longer verbally answering any questions. Determined a necessity to send to ER for eval. Inmate was sent via pro-med." Defendant Jessica Fairbanks, LPN, entered her notes at 4:22 p.m. on February 19, 2020. The video however does not show Defendant Jessica Fairbanks, LPN, in the cell until 3:36 p.m. where she is present with Defendant Katy Castillo, LPN, and a Health West (mental health evaluator) individual as they dress Tiffany Davis for her transport to the hospital. There is no medical assessment completed at 3:36 p.m. The Pro-Med EMTs arrived to HD11 at 3:46 p.m. to finally transport Tiffany Davis to the hospital where she would be dead in just a short period of time due to her serious medical needs that went ignored at the jail by named Defendants.

112.    When presented with the specific facts that even after two days of observing Tiffany Davis' health completely fail, resulting in her death, the investigating officers asked Defendant David Lopez, LPN, as to whether he would change anything he did in reference to Tiffany Davis' care; Defendant David Lopez, LPN, responded that he was "…hundred percent certain I would still follow the same steps that I did…" Defendant David Lopez', LPN, clear affirmation that he would not change any of his conduct ratified that his conduct of doing nothing to treat Tiffany Davis' serious medical needs was indeed deliberately indifferent.

113.    Per the ambulance run sheet, the Pro-Med ambulance crew was called at 3:36 p.m., arrived at the scene at 3:41 p.m. and were with Tiffany Davis in her cell at 3:46 p.m. The nature of the call is noted as "Psychiatric/Abnormal Behavior/Suicide Attempt." Their run sheet indicated the following: "A- ATF PT ON A JAIL MATTRESS OPEN EYED LAYING LEFT SIDE FETAL POSITION, SELDOM MAKING EYE CONTACT, MOANING RANDOMLY, NON PURPOSEFUL MOVEMENTS SOME DARK BRUISES ON THE HANDS / FOREARMS NOTED, PT SPOKE CLEARLY ONLY ONE FOUR LETTER WORD ONCE, PUPILS UNEQUAL (THE LEFT BEING APPROXIMATELY 2-3 mm LARGER UNKNOWN IF NORMAL ANISOCORIA) DIALTED AND REACTIVE, PMS x4, PUSHING THE BALLS OF HER FEET DOWN AWAY APPEARANCE OF DECEREBRATE POSTURING WITH THE FEET ONLY, RESPIRATORY RATE / EFFORT / AND DEPTH CHANGING EVERY FEW MINUTES…NO OBVIOUS SIGNS OF HEAD TRAUMA, NO SEIZURES REPORTED TO OR WITNESSED BY EMS…" The ambulance crew assessed Tiffany Davis' Glasgow Coma score at 10, which is critically low, indicating "moderate brain injury." No named Defendant, Defendant Wellpath agent, Defendant Medical Personnel, Defendant Deputy or Defendant Muskegon County employee/deputy named herein told the Pro-Med ambulance crew about Tiffany Davis' many seizures that they witnessed, or that were reported to them. Thus, the emergency medical staff at the hospital were significantly and critically uninformed by the Pro-Med ambulance crew since all Defendants continued to be deliberately indifferent by not providing Tiffany Davis' symptoms such as her seizures.

114.    The ambulance crew, within just a matter of minutes, was able to identify the serious medical crisis that Tiffany Davis had been experiencing for days which had been in plain view of Defendant Medical Personnel and Defendant Deputies named herein, for example the decerebrate posturing, which indicates severe damage to the brain. All symptoms of a serious

medical need were ignored by Defendant Deputies, Defendant Medical Personnel, any other agent of Defendant Muskegon County and any other agent of Defendant Wellpath after days of interactions with and observations of Tiffany Davis.

115.   Defendant David Lopez, LPN, worked tirelessly on February 19, 2020, to ensure that Defendant Wellpath and/or Defendant Muskegon County would not be charged by the hospital for the expensive treatment of Tiffany Davis' serious medical needs and to certainly deflect criminal and/or civil liability of their deliberate indifference. He insistently demanded that Tiffany Davis' medical needs be classified as "altered mental state" in an attempt to classify the sickness as a mental health issue despite his personal observations of her failing physical health via seizure activity, neurological deterioration, fever, dilated pupils, vomiting, nausea, lack of balance, and crying out due to head pain despite no evidence of head trauma.

116.   In fact, as a matter of gamesmanship, Defendant David Lopez, LPN, called and arranged for Health West representatives, who are strictly mental health evaluators, to come to the cell to witness Tiffany Davis' "altered mental state" so that the Health West mental health evaluators would make the final determination that Tiffany Davis needed emergency care (per the ambulance report) for her mental health needs <u>and</u> <u>not</u> physical needs. This tactic was an attempt to coverup the fact that Tiffany Davis was indeed going to the hospital for her serious physical medical needs (not mental health) due to the many days of Defendants' deliberate indifference. As stated by the ambulance run sheet, "Health West came to mcj to eval the pt and requested MCJ to call for transport to Hackley Er."

117.   When questioned by the criminal investigators and knowing that they may be exposed to criminal and civil liability, Defendant David Lopez, RN, and Defendant Jessica Fairbanks, LPN, both decided to state that it was <u>their</u> decision to call for the ambulance despite what was previously documented as Health West being the ambulance requestors. Defendant

David Lopez, LPN, stated to the investigators, "…I don't know if I charted it but I know I had requested from the ah, Shift Commander that Tiffany be sent to the hospital and he said he wanted, ah, mental health to see her first before she went." Defendant David Lopez, LPN, further stated to the investigators when asked who actually wanted Tiffany Davis assessed for mental he stated, "I did not. The jail wanted her assessed" for "mental." However, completely contrary to Defendant David Lopez', RN, statement to the investigators is Sgt. Eric Ridout's internal report to Defendant Lt. Smith stating that shortly after 3:00 p.m. that he "was requested by medical staff to have Health West do a consult on a patient in Holding 11."

118.    On February 19, 2020, Defendant, David Lopez, LPN, who is neither a deputy or officer of the court, continued his coverup mission and actively engaged in ensuring that Tiffany Davis' bond be changed from a cash bond (which would mandate that she still be under the legal/custodial control of Defendant Muskegon County and care of Defendant Wellpath), to a personal bond. He personally submitted all paperwork to a judge for the entry of a legal order to ensure that the bond be changed to a personal bond so that Defendant Wellpath and / or Defendant Muskegon County would deflect liability and not be charged for the medical care of Tiffany Davis while at the hospital. He was successful in finding a judge and submitted an ex parte request to change the bond to a personal bond, which when given mandated that Tiffany Davis would no longer be in the custodial status of Defendant Muskegon County Sheriff and Defendant Wellpath. This change in custodial status would mandate the billing be attributed to Tiffany Davis as a non-jailed citizen.

119.    To further achieve his goal, Defendant David Lopez, LPN, admitted to the investigating officers that despite all of the serious physical medical conditions observed by himself and the Defendant Medical Personnel named herein, that he personally declared Tiffany Davis' medical condition to be classified as "altered mental status" as the reason for her

hospitalization, and he also filled out a form indicating that her hospitalization was for off-site "mental visits." Thus, under this false "status" classification, Defendant Muskegon County and / or Defendant Wellpath attempted to shed itself of responsibility for the medical bill for Tiffany Davis' treatment, and ensure the bill be remitted to her or possibly a public government funding resource. By design, Defendant Wellpath and Defendant Muskegon County chose to classify Tiffany Davis' medical needs as a mental health classification to insulate themselves from exposure of their liability due to their deliberate indifference to her serious medical needs as well as for their own greed to not be billed for her expensive hospital stay.

120.    Tiffany Davis presented to Hackley Hospital on February 19, 2020, at approximately 4:11 p.m. with no medical personnel from Defendant Wellpath and with no jail records or Defendant Wellpath medical charts to inform the emergency staff of her medical condition. She was guarded by a Muskegon County Sheriff deputy. Dr. Towns along with Dr. Oetman examined Tiffany Davis in the emergency room. Dr. Towns specifically noted that the Muskegon County Sheriff deputy that guarded her was not able to give any "history as he was simply told to bring her hand [sic], he does not know anything about her." Yet again, the named Defendants continued their deliberate indifference by not presenting valuable information to the emergency room doctors, thus delaying their ability to quickly and effectively treat her for the dire medical crisis.

121.    Dr. Oetman noted that Tiffany Davis presented as "not alert or oriented, she does not respond to verbal commands or even painful stimulation." During his physical examination upon her arrival, Dr. Oetman noted that "Patient is not oriented to person place or time." Blood culture labs and a CT scan of her head were ordered among other testing. It is charted that during the emergency room physical examination of Tiffany Davis, "Wandering eye movements are appreciated to the left with a right beating nystagmus." She presented in a critical medical

condition at the hospital upon first arrival due to Defendants' unconstitutional conduct and clearly contrary to Defendant Medical Personnel's unremarkable medical assessments.

122.    During Dr. Towns' physical examination in the emergency room, he noted that "Patient is laying supine and rolling head back and forth slowly. When asked her name she does look at me and then starts looking around the room mostly at the ceiling. She does have constant slow deviation of her eye towards the left with a right beating nystagmus that is constant….Patient does not verbalize any response to any questions. She does not respond to sternal rub or painful stimuli but does move her extremities spontaneously unintentionally." There was no blunt trauma found to Tiffany Davis' head. Blood lab work with two cultures were ordered along with a CT scan of her head. Her blood was drawn, and lab results were very abnormal especially her lactic acid leukocytosis and bilirubin. The blood culture collected 02/19/20 at 1720 hours was positive for Streptococcus pneumoniae and the blood culture collected 02/19/2020 at 1724 hours was positive for Streptococcus pneumoniae. Her drug abuse screen was negative. The CT scan of Tiffany Davis' head revealed numerous brain hemorrhages notably the following relevant results: "There are multiple acute intraparenchymal hemorrhages. Hemorrhage in the anterior right front lobe measures up to 6 mm in diameter. Additional hemorrhage in the more superior right frontal lobe measures up to 1.8 cm in diameter. Hemorrhage in the left frontal lobe measures up to 2.3 cm in diameter. 2 hemorrhages in the posterior left frontal lobe measure up to 0.8 cm in diameter and 1.2 cm. There are also 2 tiny hemorrhages within the left occipital lobe, measuring 0.3 cm and 0.4 cm. Mild edema surrounds these hemorrhages, with effacement of the overlying sulci. Minimal ill-defined hyperdensity along the lateral inferior right frontal lobe is likely subarachnoid…" The report further indicated the active problem of Intraparenchymal hemorrhage of brain (CMS/HCC). Due to the deliberate indifference to Tiffany Davis' serious medical needs by all named Defendants herein, she presented to the hospital in a near death and critical stage of sepsis with brain

hemorrhaging and other organ dysfunction. She was dying upon arrival and the named Defendants'
groomed her path to her death.

123.     While in the emergency room, Tiffany Davis' vital signs became very unstable and
her temperature started to rise. Various medications were ineffective as her medical needs were so
far advanced due to the lack of treatment at the Muskegon County Jail by the Defendant Deputies
and Defendant Medical Personnel. Therefore, Dr. Towns was forced to intubate Tiffany Davis as
"she was altered and not protecting her airway and more so as we would need to administer
sedating medications to improve her worsening tachycardia and hypertension in the setting of the
intracranial bleeds." Dr. Towns then "set up a central line to the right subclavian area along with
arterial line to the right radial artery." Dr. Towns' impression was that that Tiffany Davis suffered
from multiple intraparenchymal hemorrhages, 7 in total; small subarachnoid hemorrhage; sepsis,
suspect endocarditis with septic emboli; encephalopathy; bandemia and elevated lactic acid. Dr.
Towns charted that she suffered from severe sepsis and labeled her a critically ill patient. Thus,
Tiffany Davis was transferred to the ICU for care with the neurosurgical team.

124.     At approximately 3:00 a.m. on February 20, 2020, Dr. Brusveen and Dr. Misciasci,
charted that Tiffany had fixed and dilated pupils, that another CT "demonstrated redemonstration
of scattered parenchymal hemorrhages that increased size number since prior study." Dr. Brusveen
indicated, "Extremely poor prognosis. Need to find family." The doctors also charted that she was
suffering from acute encephalopathy with multiple bilateral intra-parenchymal hemorrhages,
severe sepsis with septic shock with strep bacteremia, ventilator dependent respiratory failure,
lactic acidosis, thrombocytopenia, and transaminitis. Within hours of Tiffany being brought to the
hospital from the care of all of the named Defendants herein at the Muskegon County Jail, and at
approximately 5:07 a.m. on February 20, 2020, Dr. Marquart of the neurosurgery department
charted that "Patient appears to be approaching brain death." In furtherance of their deliberate

indifference conduct, Defendant Wellpath and Defendant Muskegon County chose to not offer or give the hospital the contact information for Tiffany Davis' next of kin.

125.    Due to the complete deliberate indifference to Tiffany Davis' serious medical needs by the Defendant Deputies and Defendant Medical Personnel, she was eventually declared brain dead, as she lost her battle to the infection that she contracted in the Muskegon County Jail. The bacterial infection attacked her body and the symptoms of the infection manifested itself in so many obvious ways to all that observed her at the Muskegon County Jail on February 18th and 19th. But yet, nothing was done for treatment other than to "monitor" her.

126.    Per Defendant Carleen Blanche's, RN, executed inmate health services charge slip for her "medical" services to Tiffany Davis, a simple blood draw (that would likely have revealed her infection) is documented at a cost of $5.00. This simple and cheap blood draw, if completed on February 18, 2020, when the Defendant Deputies and Defendant Medical Personnel were informed and/or made their observations of her serious medical needs, would have had a positive effect on saving her life and addressing her medical needs well in advance of forcing her to lie in pain on the cement floor suffering from decerebrate posturing etc. Instead, the Defendants named herein made a choice to follow their unconstitutional policies and practices and customs; to be deliberately indifferent to Tiffany Davis' serious medical needs as they denied her medical treatment for her serious medical conditions as exhibited by her many seizures sustained and the many other symptoms described above. The Defendants named herein were deliberately indifferent as they denied the requests from so many people to take Tiffany Davis to the hospital, or as they documented their own deliberate indifference of utilizing the wait and see approach, or continuing to allow ineffective medical care after observing Tiffany Davis' worsening medical conditions. The Defendants again falsely believed her decrepit condition as being factitious as illustrated by the callous statement of Defendant Danielle Carlson, RN, who stated in jest to

Defendant Carleen Blanche, RN, before her shift began on February 18, 2020, that "Tiffany was trying to get to the hospital."

127.   Tiffany Davis was brain dead until February 24, 2020, where she made the ultimate gift to humanity by donating her body's organs that were not destroyed in this tragedy. The Gift of Live of Michigan harvested her organs as a donation to help another person continue to live. A gift that Tiffany Davis was never given by the Defendant Deputies and Defendant Medical Personnel —a chance at life.

128.   In light of yet another death in custody in a very short period of time at the Muskegon County Jail, an autopsy was performed by Dr. Elizabeth Douglas of the Western Michigan University Homer Styker MD School of Medicine Medical Examiner and Forensic Services. However, prior to the autopsy, the medical examiner's office investigator conducted an interview of Defendant Carleen Blanche, RN. The investigator documented his interview with Defendant Carleen Blanche, RN, who stated that Tiffany Davis "was presented to jail medical staff by deputies around 10:30 a.m. on the 18th. Deputies believed the decedent may have been experiencing a seizure due to the decedent sitting on the floor and shaking. The decedent gave a complaint of feeling sick to her stomach and some confusion…..Approximately 1830 hours, deputies again notified medical staff of possible seizure activity by the decedent in her cell. At that time, evaluation by the medical staff reveal the decedent was shaking but alert and able to answer easy questions."

129.   Dr. Elizabeth Douglas concluded that the cause of death was complications of acute widespread cerebral hemorrhagic infarcts and due to invasive pneumococcal disease of uncertain origin. The manner of death was normal. She ordered a postmortem toxicology which did not reveal any unlawful or positive results for any illegal substance or any positive findings of toxicological significance.

130.     In  her  interview  with  the  criminal  investigating  officers,  Defendant  Carleen

Blanche, RN, shed light on Defendant Wellpath's policies and customs in place at the Muskegon

County  Jail,  such  as  allowing  the  delegation  of  services  and/or  tasks  and/or  oversight  and/or

supervision  to  improperly  licensed  medical  personnel,  not  ordering  or  completing  lab  work  on

inmates  because  it  could  expose  more  health  problems  resulting  in  more  costs  to  care  for  the

inmate, allowing and promoting medical staff to utilize the wait-and-see approach as the method

of evaluating serious medical needs rather than obtaining proper or prompt medical care, and the

policy and custom of allowing the incomplete medical charting and follow up medical care,  all of

which  directly  led  to  the  death  of  Tiffany  Davis.  These  policies  and  customs,  so  ingrained  in

Defendant  Wellpath's  employees,  gave  Defendant  Carleen  Blanche,  RN,  pause  as  these  same

unconstitutional  policies  and  customs  were  still  being  followed  from  one  year  earlier  when  they

caused the in-custody death of inmate Paul Bulthouse.

131.     As  depicted  in  the  video,  "observation  cells"  HD8,  HD6  and  HD11  are  all  in  plain

view  of  the  booking  area  where  the  deputies  and/or  medical  staff  can  see  into  the  cell  and  can  also

observe  the  live  cell  feeds  on  the  monitor[s].  For  approximately  twenty-six  hours,  Tiffany  Davis

was  detained  in  one  of  the  three  cells,  which  are  front  facing  holding  cells  located  across  from  the

booking  area  where  the  deputies  sit  and  near  the  medical  office.  All  of  Tiffany  Davis'  daily

activities  could  be  observed  including  if  she  ate  or  drank.  Through  the  large  window  in  her

observation  holding  cell,  Tiffany  Davis  was  plainly  visible  to  all,  including  those  walking  by  her

cell,  and  via  the  camera  in  her  cell  that  displayed  the  entire  room.  Her  dire  condition  was  obvious

to  anyone  who  looked  at  her  whether  in  person  or  on  live  video.  Every  single  deputy,  supervising

deputy,  and  medical  personnel  who  was  in  the  booking  area  including  all  Defendants  named  in

this  complaint  (with  the  possible  exception  of  Defendant  Sheriff  Poulin  and  Defendant  Lt.  Smith),

observed  Tiffany  Davis  and  saw  that  she  was  obviously  in  need  of  immediate  medical  attention

for a serious medical need. It was absolutely clear to all of the individual defendants that her condition was worsening day after day and that she needed to be taken to a hospital or to an acute care facility.

132.    All Defendants named herein this complaint acted with deliberate indifference to Tiffany Davis' serious medical needs and subjected her to inhumane conditions of confinement that amounted to punishment in allowing her to suffer from pain of the infection and from brain bleeds without adequate medical care; allowing her to remain in overcrowded cells with inadequate space to sit, and allowing her to remain in cells with inadequate sleeping accommodations by mandating that she lie on the cement floor with a blanket. All acts and omissions committed by all of the respective individual defendants named herein were committed with malice or with reckless disregard for Tiffany Davis' constitutional rights.

133.    As a result of the allegations contained in this complaint, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith, in their official capacity are liable under 42 U.S.C. § 1983 for maintaining unconstitutional policies and customs that resulted in the violation of Tiffany Davis' clearly established 4th, 8th, and/or 14th Amendment right to adequate medical care and to be free of inhumane conditions of confinement. As a direct and proximate result of Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith's unconstitutional acts and omissions in their official capacity, Tiffany Davis experienced extreme physical pain and suffering, severe mental anguish, and death.

134.    As a result of the allegations contained in this complaint, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, in their official capacity, are liable under 42 U.S.C. § 1983 for maintaining unconstitutional policies and customs that resulted in the violation of Tiffany Davis' clearly established 4th, 8th, and/or 14th Amendment right to adequate

medical care and to be free of inhumane conditions of confinement. As a direct and proximate result of Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez', LPN, unconstitutional acts and omissions, in their official capacity, Tiffany experienced extreme physical pain and suffering, severe mental anguish, and death.

135.   From the beginning of February 18, 2020, until her death on February 24, 2020, Tiffany Davis' constitutional rights, including her right to be free from the deliberate indifference to her serious medical needs and her right to be free from cruel and unusual punishment, were continuously and repeatedly violated by the Defendants named herein resulting in days of mental and physical agony, causing and culminating in her death, and giving rise to this action under 42 U.S.C. § 1983.

136.   Tiffany Davis did not die immediately, and instead suffered great conscious pain and suffering as a direct and proximate result of the said acts of all named Defendants herein, and the policies and customs of Defendant Muskegon County and Defendant Wellpath.

137.   That the above described conduct of all of the herein Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

      a.      Death;

      b.      Reasonable medical, hospital, funeral and burial expenses;

      c.      Conscious pain and suffering, physical and emotional;

      d.      Humiliation and/or mortification;

      e.      Mental anguish;

      f.      Economic damages;

      g.      Loss of love, society, and companionship;

      h.      Loss of gifts, gratuities, and other items of economic value;

     i.      Parental and spousal guidance, training, and support;

     j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

     k.     Attorney fees and costs pursuant to 42 USC § 1988; and

     l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

### COUNT I:
### §1983 FAILURE TO PROVIDE MEDICAL CARE / DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS IN VIOLATION OF THE 4TH, 8TH, AND/OR 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION (ALL DEFENDANTS)

138.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

139.    That the acts or omissions by all named Defendants in this complaint including: Defendant Muskegon County, Defendant Sheriff Poulin, Defendant Lt. Smith, Defendant Deputy Van Amburg, Defendant Deputy Root, Defendant Deputy Smith, Defendant Deputy Lane, Defendant Deputy Temple, Defendant Deputy Schubert, Defendant Deputy Ahrens, Unknown Defendant Deputies, Defendant Wellpath, Defendant Joseph Natole, Jr. MD PC, Defendant Dr. Natole, Defendant Heather Ihrig, Defendant David Lopez, LPN, Defendant Danielle Carlson, RN, Defendant Carleen Blanche, RN, Defendant Britni Brinkman, EMT, Defendant Sara Bruce, EMT, Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN; Jane Doe and John Doe were unreasonable and performed knowingly, deliberately, indifferently, intentionally, maliciously, and with callousness, and deliberate indifference to Plaintiff's Decedent, Tiffany Davis' well-being and serious medical needs in violation of the 4th, 8th, and 14th Amendments to the United States Constitution.

140.    That the Defendants: Defendant Muskegon County, Defendant Sheriff Poulin, Defendant Lt. Smith, Defendant Deputy Van Amburg, Defendant Deputy Root, Defendant Deputy Smith, Defendant Deputy Lane, Defendant Deputy Temple, Defendant Deputy Schubert, Defendant Deputy Ahrens, Unknown Defendant Deputies, Defendant Wellpath, Defendant Joseph Natole, Jr. MD PC, Defendant Dr. Natole, Defendant Heather Ihrig, Defendant David Lopez, LPN, Defendant Danielle Carlson, RN, Defendant Carleen Blanche, RN, Defendant Britni Brinkman, EMT, Defendant Sara Bruce, EMT, Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN; Jane Doe and John Doe, possessed a sufficiently culpable state of mind in denying medical care for Plaintiff's Decedent Tiffany Davis' serious medical needs.

141.    That Plaintiff's Decedent Tiffany Davis' serious medical conditions were ones that were so obvious that even a lay person would have easily recognized the necessity for a doctor's immediate attention or emergency care.

142.    That Plaintiff's Decedent Tiffany Davis' serious medical condition deteriorated with the onset of new and alarming symptoms after medical evaluations or medical assessments thus requiring notifying qualified professional medical personnel and/or acute emergency medical care to provide medical care which was not provided by all named Defendants.

143.    That Plaintiff's Decedent Tiffany Davis' serious medical conditions were so obvious that any medical attention that she received was so cursory and woefully inadequate amounting to no treatment at all and thus deliberate indifference.

144.    That the aforementioned Defendants adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including failing to train, discipline and/or supervise its employees/agents, which were the motivating force for the individual Defendants' conduct as described herein, such that the same also amounted to a

deliberate indifference to Plaintiff's Decedent Tiffany Davis' well-being and serious medical needs.

145. That the conduct of the aforementioned Defendants, individually, corporately and as agents of said Defendants, deprived Plaintiff's Decedent Tiffany Davis of her clearly established rights, privileges, and immunities guaranteed to her under the United States Constitution, specifically those set forth under the 4th, 8th, and 14th Amendments, as evidenced by the above incorporated facts and the following particulars, including but not limited to:

    a. Failing to request or delay in requesting emergency medical treatment during, after being notified, and/or observing that Tiffany Davis was suffering from seizures, or from the many symptoms of a bacterial infection, inclusive of headache, severe pain, nausea, vomiting, involuntary movements, and photophobia, decerebrate posturing, tremors, confusion, dizziness, lack of balance, hypertension, fever, tachycardia, not being alert or oriented, not responding to verbal commands or painful stimulation, dilated pupils, agitation, severe frontal lobe head pain, and an abnormal urinalysis result (with negative drug toxicology and negative pregnancy results);

    b. Being deliberately indifferent to Tiffany Davis' serious medical needs as described above that were obvious to a lay person and providing no medical treatment or causing a delay in medical treatment;

    c. Providing a medical response to Tiffany Davis' serious medical needs that was so inadequate that it was patently unreasonable;

    d. Failing to observe and check on Tiffany Davis as she exhibited numerous serious medical needs and was in distress;

    e. Consciously exposing Tiffany Davis to an excessive risk of serious harm;

f.   Ignoring requests to provide Tiffany Davis with the needed medical treatment;

g.   Failing to request and delaying medical attention when it was apparent that Tiffany Davis was unresponsive or her medical conditions / symptoms were deteriorating even after being medically assessed, or where Defendant Deputies and Defendant Medical Personnel had reason to believe that the prior medical assessment of Tiffany Davis' condition was not reliable;

h.   Failing to determine if Tiffany Davis was malingering with constant monitoring in the face of her worsening condition;

i.   Failing to transfer Tiffany Davis to the hospital for treatment, monitoring, observation, and supportive measures;

j.   Placing Tiffany Davis in a holding cell, and failing to adequately observe and/or monitor her, notwithstanding her known serious medical needs;

k.   Failing to perform necessary jail cell checks and observations;

l.   Delaying necessary medical treatment for a serious medical need after symptoms worsened after medical evaluations were conducted;

m.   Failing to properly train and supervise the individuals within the Muskegon County Jail having custodial and/or caregiving responsibilities over Tiffany Davis, to ensure her serious medical needs were timely and properly tended to, and to ensure the above breaches/deviations were not committed.

146.   That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.   Death;

b.   Reasonable medical, hospital, funeral and burial expenses;

    c.       Conscious pain and suffering, physical and emotional;

    d.       Humiliation and/or mortification;

    e.       Mental anguish;

    f.       Economic damages;

    g.       Loss of love, society, and companionship;

    h.       Loss of gifts, gratuities, and other items of economic value;

    i.       Parental and spousal guidance, training, and support;

    j.       Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

    k.       Attorney fees and costs pursuant to 42 USC § 1988;

    l.       Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

### COUNT II:
### CRUEL AND UNUSUAL PUNISHMENT
### IN VIOLATION OF THE 4TH, 8TH, AND 14TH AMENDMENTS
### OF THE UNITED STATES CONSTITUTION
### (ALL DEFENDANTS)

147.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

148.    Pursuant to the 4th, 8th, and 14th Amendments of the United States Constitution, at all times relevant, Plaintiff's Decedent Tiffany Davis had a right to be free from cruel and unusual

punishment as a pretrial detainee and as a sentenced inmate while incarcerated under the custody and control of all Defendants at the Muskegon County Jail.

149.    Notwithstanding duties to prevent the cruel and unusual punishment of Tiffany Davis while under their custody and control, all Defendants knowingly incarcerated her under conditions posing and exacerbating a substantial risk of serious harm to her.

150.    All Defendants repeatedly and willfully failed to provide Tiffany Davis with medical care and/or delayed medical care that was necessary to treat her serious medical needs, and all Defendants repeatedly and willfully failed to provide such treatment, care, and assistance, although they were on notice of Tiffany Davis' serious medical needs, and although they knew that in so doing, they were depriving Tiffany Davis of basic needs and violating her constitutional rights.

151.    All Defendants also repeatedly and willfully subjected Tiffany Davis to the unnecessary and wanton infliction of pain by restricting her in a locked cell for many hours naked and without adequate food, hydration, and sleeping arrangements where she was forced to sleep on the floor with no bedding or mattress while she experienced the numerous symptoms described above due to her serious medical needs that greatly sickened her. All Defendants repeatedly and willfully subjected Tiffany Davis to a substantial risk of physical harm, the unnecessary infliction of pain, the deprivation of nourishment and sleep, and creating a risk of particular discomfort and humiliation. All Defendants knew that in so doing, they were depriving Tiffany Davis of basic needs and violating her constitutional rights.

152.    Throughout her final days of incarceration, the failure to provide medical treatment and the delay of medical treatment to Tiffany Davis by each and every Defendant, constituted cruel and unusual punishment in violation of her 4th, 8th, and 14th Amendment rights.

153.    That the acts or omissions by all Defendants, as more specifically described above, were unreasonable and performed knowingly, deliberately, indifferently, intentionally, maliciously, and with gross negligence, callousness, and deliberate indifference to Tiffany Davis' well-being.

154.    That the law was clearly established at the time of this incident and Defendants' actions were not objectively reasonable and they are not entitled to qualified immunity.

155.    That the Defendants adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failing to train, discipline and/or supervise its employees/agents, which were the motivating force for the individual Defendants' conduct as described herein, such that same also amounted to a deliberate indifference to Tiffany Davis' well-being.

156.    That the conduct of all of the Defendants, individually, corporately and as agents of said individual Defendants, deprived Tiffany Davis of her clearly established rights, privileges, and immunities guaranteed to her under the United States Constitution, specifically those set forth under the 4th, 8th, and 14th Amendments to same, as evidenced by the following particulars, including but not limited to:

  a. Failing to request or delay in requesting emergency medical treatment during, after being notified, and/or observing that Tiffany Davis was suffering from seizures, or from the many symptoms of a bacterial infection, inclusive of headache, severe pain, nausea, vomiting, involuntary movements, and photophobia, decerebrate posturing, tremors, confusion, dizziness, lack of balance, hypertension, fever, tachycardia, not being alert or oriented, not responding to verbal commands or painful stimulation, dilated pupils, agitation, severe frontal lobe head pain, and an

abnormal urinalysis result (with negative drug toxicology and negative pregnancy results);

b. Being deliberately indifferent to Tiffany Davis' serious medical needs as described above that were obvious to a lay person and providing no medical treatment or causing a delay in medical treatment;

c. Providing a medical response to Tiffany Davis' serious medical needs that was so inadequate that it was patently unreasonable;

d. Failing to observe and check on Tiffany Davis as she exhibited numerous serious medical needs and was in distress;

e. Consciously exposing Tiffany Davis to an excessive risk of serious harm;

f. Ignoring requests to provide Tiffany Davis with the needed medical treatment;

g. Failing to request and delaying medical attention when it was apparent that Tiffany Davis was unresponsive or her medical conditions / symptoms were deteriorating even after being medically assessed, or where Defendant Deputies and Defendant Medical Personnel had reason to believe that the prior medical assessment of Tiffany Davis' condition was not reliable;

h. Failing to determine if Tiffany Davis was malingering with constant monitoring in the face of her worsening condition;

i. Failing to transfer Tiffany Davis to the hospital for treatment, monitoring, observation and supportive measures;

j. Placing Tiffany Davis in a holding cell, and failing to adequately observe and/or monitor her, notwithstanding her known serious medical needs;

k. Failing to perform necessary jail cell checks and observations;

l.   Delaying necessary medical treatment for a serious medical need after symptoms worsened after medical evaluations were conducted;

m.  Failing to properly train and supervise the individuals within the Muskegon County Jail having custodial and/or caregiving responsibilities over Tiffany Davis, to ensure her serious medical needs were timely and properly tended to, and to ensure the above breaches/deviations were not committed.

157.  That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.   Death;

b.   Reasonable medical, hospital, funeral, and burial expenses;

c.   Conscious pain and suffering, physical and emotional;

d.   Humiliation and/or mortification;

e.   Mental anguish;

f.   Economic damages;

g.   Loss of love, society, and companionship;

h.   Loss of gifts, gratuities, and other items of economic value;

i.   Parental and spousal guidance, training, and support;

j.   Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.   Attorney fees and costs pursuant to 42 USC § 1988;

l.   Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

**COUNT III:**
**§1983 INDIVIDUAL SUPERVISORY LIABILITY**
**(DEFENDANT DR. NATOLE, and DEFENDANT DAVID LOPEZ, LPN)**

158.     Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

159.     That Defendant Dr. Natole and Defendant David Lopez, LPN, directly participated in the unconstitutional conduct of their subordinate Defendant Medical Personnel's conduct when they were deliberately indifferent to Tiffany Davis' serious medical needs and when they conducted cruel and unusual punishment on her violating her constitutionally protected rights as more fully described above and below.

160.     As a result of Defendant Dr. Natole and Defendant David Lopez', LPN, own actions or inactions, Tiffany Davis was subjected to deprivation of her constitutional rights as more fully described above and below.

161.     That Defendant Dr. Natole and Defendant David Lopez, LPN, implicitly authorized, approved or knowingly authorized the misconduct as more fully described above and below.

162.     That Defendant Dr. Natole and Defendant David Lopez, LPN, did directly conspire, actively participate with and encourage the described unlawful conduct and deprivation of Tiffany Davis' constitutional rights.

163.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs pursuant to 42 USC § 1988;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

**COUNT IV:**
**§1983 FAILURE TO INTERVENE TO PREVENT VIOLATION OF TIFFANY DAVIS'**
**4TH, 8TH, AND 14TH AMENDMENT RIGHTS**
**(DEFENDANT DEPUTIES and DEFENDANT MEDICAL PERSONNEL)**

164.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

165.    Defendant Deputies and Defendant Medical Personnel had a duty to intervene when Tiffany Davis' rights under the 4th, 8th, and 14th Amendments to the United States Constitution and 42 USC § 1983, were violated by failing to ensure that medical treatment for a serious medical need was obtained and that she was not subjected to cruel and unusual punishment.

166.    Defendant Deputies and Defendant Medical Personnel observed or had reason to know that Tiffany Davis had serious medical needs that required immediate medical treatment and were deliberately indifferent to that need and that she was being subjected to cruel and unusual punishment.

167.    Defendant Deputies and Defendant Medical Personnel were deliberately indifferent to Tiffany Davis' serious medical needs and acted with conduct that was cruel and unusual punishment. Defendant Deputies and Defendant Medical Personnel failed to intervene despite their duty to do so, and were each thereby a direct and proximate cause of her pain, suffering and death.

168.    The foregoing conduct by Defendant Deputies and Defendant Medical Personnel, itself amount to a constitutional violation of Tiffany Davis' rights under the 4th, 8th, and 14th Amendments to United States Constitution.

169.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.    Death;

b.      Reasonable medical, hospital, funeral and burial expenses;

c.      Conscious pain and suffering, physical and emotional;

d.      Humiliation and/or mortification;

e.      Mental anguish;

f.      Economic damages;

g.      Loss of love, society, and companionship;

h.      Loss of gifts, gratuities, and other items of economic value;

i.      Parental and spousal guidance, training, and support;

j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.      Attorney fees and costs pursuant to 42 USC § 1988;

l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

<u>COUNT V:</u>
<u>§1983 MUNICIPAL/SUPERVISORY LIABILITY:</u>
<u>(DEFENDANT COUNTY OF MUSKEGON,</u>
<u>DEFENDANT SHERIFF POULIN AND DEFENDANT LT. SMITH)</u>

170.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

171.    Defendant County of Muskegon, Defendant Sheriff Poulin, and Defendant Lt. Smith acted recklessly and/or with deliberate indifference when it practiced and/or permitted customs, policies, and/or practices that resulted in violations to Tiffany Davis' constitutional rights of citizens to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution. Defendant County of Muskegon is also liable for Defendant Wellpath's unconstitutional customs, policies, and/or practices through the non-delegable duty doctrine.

172.    At all times relevant, Defendant County of Muskegon, Defendant Sheriff Poulin, and Defendant Lt. Smith refused to provide the deputies and agents of the Muskegon County Sheriff's Department, any training, discipline and supervision with regard to the constitutional rights of citizens to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution; refused to provide said deputies and agents with supervision and discipline to protect the constitutional rights of citizens; refused to require their deputies and agents to follow policies and procedures, and state and federal law relating to the right of a detainee/inmate to be provided with  medical care for serious medical needs.

173.    At all times relevant, Defendant County of Muskegon, Defendant Sheriff Poulin, and Defendant Lt. Smith knew or should have known that the policies, procedures, training supervision and discipline of the deputies and agents of the Muskegon County Sheriff's Department, were inadequate for the tasks that each Defendant was required to perform.

174.    At all times relevant, there was a complete failure to train, supervise and discipline the deputies and agents of the Muskegon County Sheriff's Department, and the training, supervision and lack of discipline were so reckless that future violations of the constitutional rights of citizens to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, as described in the preceding paragraphs, were certain to occur.

175.    At all times relevant, Defendant County of Muskegon, Defendant Sheriff Poulin, and Defendant Lt. Smith were on notice and knew that the failure of training, discipline and/or supervision of the deputies and agents of the Muskegon County Sheriff's Department with regard to the constitutional rights of citizens to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, as described herein, was inadequate and would lead to the violation of detainees/inmates' constitutional rights.

176.    At all times relevant, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith's response to this knowledge was so inadequate as to show a complete disregard for whether the deputies and agents of the Muskegon County Sheriff's Department would violate the constitutional rights of citizens to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution.

177.    Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the serious medical needs and cruel and unusual punishment of citizens, and knew or should have known that such treatment would deprive detainees/inmates of their constitutional rights.

178.    At all times relevant, there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, as described herein.

179.    At all times relevant, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith knew or should have known that there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, as described herein.

180.    Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith tolerated deputies' and agents' of the Muskegon County Sheriff's Department repeated violations

of the 4th, 8th, and 14th Amendments to the United States Constitution, which allowed Defendant Deputies and Defendant Medical Personnel to continue to engage in this unlawful conduct.

181.     Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith refused to discipline deputies and agents of the Muskegon County Sheriff's Department who violated citizens' constitutional rights to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, failed to fully investigate allegations of misconduct, looked the other way, and thus, tacitly encouraged such behavior.  In doing so, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith condoned, ratified, or encouraged said deputies and agents to violate the 4th, 8th, and 14th Amendment to the United States Constitution as a matter of policy.

182.     Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith failed to adequately train, supervise and/or discipline its deputies in the years prior to and during the time of Tiffany Davis' death in the following ways, included but not limited to:

a.     Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in identifying when a detainee/inmate is experiencing a medical need and/or medical emergency and to seek the appropriate level of medical care as illustrated in this matter in the above-stated facts when Defendant Deputies chose not to call for medical care or emergency medical care at all relevant times for Tiffany Davis;

b.     Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to determine when to re-alert jail medical personnel based upon new and alarming symptoms, and/or worsening conditions as illustrated in this matter in the

above-stated facts when Defendant Deputies failed to seek appropriate medical care when Tiffany Davis exhibited alarming symptoms or worsening conditions;

c.      Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to determine what is an acute emergency, and when to call 911 during such an acute emergency (i.e.: seizures/neurological emergency), even after notifying the jail medical staff of such an emergency as illustrated in this matter in the above-stated facts when Defendant Deputies failed to call 911 after having knowledge of Tiffany Davis' acute emergency;

d.      Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure when receiving and responding to the emergency call button from inside a detainee/inmate's cell during a medical emergency, and alerting jail medical personnel of the emergency as illustrated in this matter in the above-stated facts when Defendant Deputies were notified by inmate Keri Smith of Tiffany Davis' medical emergency;

e.      Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in identifying a serious medical need (that would be obvious to a layperson), such as Tiffany Davis' seizures, unresponsiveness, altered mental state, symptoms of infection and the adequate response to such a need. As of the time of Tiffany Davis' incarceration, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith, were put on notice of its deputies' ignorance and failure to follow its written policies, procedures, and protocols for detainees/inmates experiencing such serious medical needs and symptoms as stated above. An example of this is in the case of *Bulthouse v. County of Muskegon et al.*,

21cv00281 (W.D. Mich. 2021), whereupon the deputies failures resulted in the death of detainee/inmate Paul Bulthouse;

f.    Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure regarding detainees/inmates who are experiencing serious medical conditions, for example symptoms of infection and/or seizures and forcing them to remain in inhumane conditions of confinement with lack of medical care, bedding, or a mattress, as illustrated in this matter in the above-stated facts when Tiffany Davis was forced by Defendant Deputies to sleep on the cement floor for hours during her medical crisis. As of the time of Tiffany Davis' incarceration, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith, were put on notice of its deputies' ignorance and failure to follow its written policies, procedures, and protocols for detainees/inmates experiencing such serious medical needs and symptoms as stated above and forced to endure inhumane conditions of confinement. An example of this is in the case of *Bulthouse v. County of Muskegon et al*., 21cv00281 (W.D. Mich. 2021), whereupon the deputies failures resulted in the death of detainee/inmate Paul Bulthouse;

g.    Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to ensure that detainees/inmates receive timely medical treatment that adequately addresses their serious medical needs when deputies notify jail medical staff, and to follow up on same as illustrated in this matter in the above-stated facts and as illustrated by the many Defendant Deputies who failed to call for medical help for Tiffany Davis;

h.    Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to seek a higher level of medical treatment when the detainee/inmate has

worsening conditions and/or new and alarming symptoms after inadequate treatment by the responding jail medical personnel as illustrated in this matter in the above-stated facts when the numerous Defendant Deputies allowed Tiffany Davis to deteriorate after receiving inadequate medical treatment. An example of this is in the case of *Bulthouse v. County of Muskegon et al.*, 21cv00281 (W.D. Mich. 2021), whereupon the deputies failures resulted in the death of detainee/inmate Paul Bulthouse;

i.   Failing to adequately train and/or supervise its personnel and contracted-for medical providers with regard to complying with constitutionally-minimal rights of detainees/inmates to medical care for serious medical needs and humane conditions of confinement as illustrated in this matter in the above-stated facts;

j.   Failing to supervise, review, and/or discipline officers whom Defendant Lt. Smith, Defendant Sheriff Poulin and Defendant Muskegon County knew or should have known were violating or were prone to violate citizens' constitutional rights as illustrated in this matter in the above-stated facts, i.e.: Defendant Deputy Jamal Lane, Defendant Dr. Natole, MD, Defendant Carleen Blanche, RN, Defendant Danielle Carlson, RN, Defendant David Lopez, LPN, Defendant Jessica Fairbanks, LPN, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, who were all previously involved in the unconstitutional deprivation of rights in the Paul Bulthouse matter, thereby permitting and/or encouraging its deputies and/or agents to engage in such conduct;

k.   Failing to supervise its deputies and/or agents with regard to the established policies, procedures, and rules as stated herein, and failing to discipline or

reprimand such deputies and/or agents who violate the established policies as stated herein;

l.    Otherwise failing to adequately train and/or follow proper policy, practice, or procedure resulting in the death of Tiffany Davis.

183.    The need for deputies to be trained in these areas was and remains obvious. Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith's failure to train their deputies and agents of the Muskegon County Sheriff's Department as alleged in the preceding paragraph caused Tiffany Davis' pain, suffering, and death. Less than one year prior to Tiffany Davis' death, Paul Bulthouse died at the Muskegon County Jail as a result of the failures described in the preceding paragraph, giving notice to these Defendants of said failures. These failures of Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith caused the death of Paul Bulthouse and subsequently, Tiffany Davis and constituted a clear and persistent pattern of misconduct through a custom of inaction.

184.    Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith further maintained customs, usages, and practices, which violated the constitutional rights of detainees/inmates, such as Tiffany Davis, including but not limited to:

a.    Maintaining a practice and policy of utilizing a deputy to observe detainees/inmates who may be experiencing serious medical conditions such as seizures, neurological crises, or symptoms of sepsis/infection as stated above, which may require immediate emergency care, depicted live on a video monitor, but in turn not providing appropriate and effective training to that deputy to recognize and react accordingly to seek emergency care and/or notify jail medical staff when observing such behavior. Deputies continually watch and observe such medical emergencies

via live video feed to their computer monitor without notifying 911 and/or jail medical personnel as a result of a lack of training as illustrated in this matter in the above-stated facts. This policy existed one year prior, when Defendant Muskegon County utilized the same policy/customs as in the case of *Bulthouse v. County of Muskegon et al.*, 21cv00281 (W.D. Mich. 2021), whereupon the deputies failures resulted in the death of detainee/inmate Paul Bulthouse;

b.   Maintaining a custom and/or policy of informing and training deputies upon witnessing emergency and/or serious medical need (i.e.: seizures or severe symptoms of infection), to not call 911, but instead refer all such medical emergencies to the jail medical staff, and not seek 911 emergency help. This custom and policy promoted the deputies' unconstitutional behavior that merely alerting jail medical staff would fulfill their constitutional obligations under the 4th, 8th, and 14th Amendments pertaining to medical care for a detainee/inmate's obvious emergency medical need as illustrated in this case. This deliberate and mistaken training policy and practice was a moving force behind Defendant Deputies' failure to respond to Tiffany Davis' serious medical condition in a meaningful and constitutionally consistent fashion- including not directly calling for emergency medical care in spite of the inadequate and insufficient medical care provided to Tiffany Davis, and/or going beyond the Muskegon County Deputy's normal chain of corrections' command unit if the command officers continued to rely on Defendant Wellpath's medical decisions that were not recognizing a serious risk of harm or death to a detainee/inmate such as Tiffany Davis as illustrated above and in the case of *Bulthouse v. County of Muskegon et al.*, 21cv00281 (W.D. Mich.

2021), whereupon the deputies failures resulted in the death of detainee/inmate Paul Bulthouse;

c.      Maintaining a custom and/or policy that allows detainees/inmates who experience seizure activity and/or emergency neurological events to not be timely assessed by a physician at the jail or transferred to a hospital. This custom/policy allows medical conditions to worsen, causing more pain, suffering, and eventually death as illustrated in this case. As of the time of Tiffany Davis' pretrial detention and/or incarceration, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith, were put on notice that its contracted-for medical provider failed to have a physician complete an assessment and adequate treatment plan when a detainee/inmate experiences signs and symptoms of seizures, resulting in death. An example of this is in the case of *Bulthouse v. County of Muskegon et al.*, 21cv00281 (W.D. Mich. 2021), whereupon the deputies failures resulted in the death of detainee/inmate Paul Bulthouse;

d.      Maintaining a custom and/or policy to allow detainees/inmates who experience a serious medical condition (that would be obvious to a layperson) to not be timely assessed by a physician at the jail or transferred to a hospital. This custom/policy allows medical conditions to worsen, causing more pain, suffering, and eventually death as illustrated in this case. As of the time of Tiffany Davis' pretrial detention and/or incarceration, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith, were put on notice of its contracted-for medical provider and their failure to have a physician complete an assessment and adequate treatment plan when a detainee/inmate experiences a serious medical condition, and at times resulting in death of the inmate, in the following cases: *Bulthouse v. County of*

*Muskegon et al.*, 21cv00281 (W.D. Mich. 2021)*; Estate of Dahnontae McKinley v. Muskegon County, et al, Case No: 14-cv-00840 (*W.D. Mich. 2014*); Semelbauer v. Muskegon County, et al, Case No: 14-cv-01245 (*W.D. Mich. 2014*)*;

e.      Maintaining a custom and/or policy to allow a deputy, a non-medically trained person, to watch over an individual who is experiencing a serious medical crisis such as seizures, via a live video monitor, and to accept the deputy's visual observation as sufficient to monitoring such serious medical need when a detainee/inmate is under "medical observation, and not having the live video feed directly visible to a trained medical professional. This custom and/or practice resulted in the continuing pain and suffering caused to Tiffany Davis, and the delay in necessary medical treatment causing her death. This policy existed one year prior, when Defendant Muskegon County utilized the same policy/customs as in the case of *Bulthouse v. County of Muskegon et al.*, 21cv00281 (W.D. Mich. 2021), whereupon the deputies failures resulted in the death of detainee/inmate Paul Bulthouse;

f.      Maintaining a custom and/or policy that prohibits deputies from sending an inmate/detainee to the hospital without first obtaining medical staff approval or mental health staff approval, except in cases of non-responsiveness or conditions such as severe bleeding. In this case, as stated above, monitoring Defendant Deputies did not call 911 for Tiffany Davis after witnessing days of her deterioration due to her serious medical needs without approval from jail medical staff. This policy existed one year prior, when Defendant Muskegon County utilized the same policy/customs as in the case of *Bulthouse v. County of Muskegon*

*et al.*, 21cv00281 (W.D. Mich. 2021), whereupon the deputies failures resulted in the death of detainee/inmate Paul Bulthouse.

185.    Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith allowed Defendant Wellpath to continue its ongoing practice of substandard medical care and mental health care, putting the lives of its detainees/inmates at risk. Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith ratified Defendant Wellpath's behavior and unconstitutional conduct by continuing to extend Defendant Wellpath's contract for jail medical services at the Muskegon County Jail despite having notice and/or being constructively aware that Defendant Wellpath, formerly known as Correct Care Solutions, had a history of providing constitutionally inadequate medical care to detainees/inmates in the past and thus tacitly approved such unconstitutional conduct. That their deliberate indifference in their failure to act amounted to an official policy of inaction and that the policy of inaction was the moving force of the constitutional deprivations. Defendant County of Muskegon is also liable for Defendant Wellpath's unconstitutional customs, policies, and/or practices through the non-delegable duty doctrine.

186.    Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith have the responsibility and authority to investigate the death of any detainees/inmates in the custody of the Muskegon Sheriff's Department and/or the Muskegon County Jail, and as a matter of acts, custom, policy, and/or practice, Defendants have established a custom and/or policy to conduct purposefully meaningless criminal investigations for their in-custody deaths as it relates to their own deputies and jail medical staff, as illustrated in this case as well as in the Paul Bulthouse matter, where no criminal liability was deemed against deputies and/or jail medical staff. The custom and policy of procuring a meaningless investigation to deflect negative publicity and/or liability occurred in the Paul Bulthouse case where even when Defendant Sheriff Poulin

81

and/or Defendant Muskegon County found no criminal conduct on behalf of their deputies, a subsequent independent criminal investigation by the State of Michigan Attorney General's Office revealed a variety of criminal conduct on behalf of Deputies and/or jail medical staff through a review of the very same evidence. As stated above, these same facts presented to Defendant Muskegon County and Defendant Sheriff Poulin were the same facts used to bring involuntary manslaughter charges against deputies in the Paul Bulthouse matter.

187.    Plaintiff's injuries in this case were proximately caused by policies and practices of Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith, which by their deliberate indifference, allows their deputies to violate the constitutional rights of citizens without fear of any meaningful investigation or punishment.  In this way, Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith violated Plaintiff's rights since they created the opportunity for the individually named Defendant Deputies to commit the foregoing constitutional violations, some of whom are the same defendants in the Paul Bulthouse matter.

188.    The misconduct described in preceding paragraphs has become a widespread practice, and so well settled as to constitute *de facto* policy in the Muskegon County Sheriff's Department.  This policy was able to exist and thrive because governmental policymakers have exhibited deliberate indifference to the problem, thereby ratifying it.

189.    The widespread practice described in preceding paragraphs was allowed to flourish because Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith have declined to implement sufficient hiring, training and/or legitimate and/or effective mechanisms for oversight and/or punishment of police officer misconduct.

190.    The policies and practices of Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith directly and proximately led to the injuries and death that Tiffany

Davis suffered at the hands of Defendant Deputies, Defendant Medical Personnel and Unknown Defendant Deputies.

191.    That the above described conduct of Defendant Muskegon County, Defendant Sheriff Poulin, and Defendant Lt. Smith, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs pursuant to 42 USC § 1988;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-

Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT VI:
## §1983 MUNICIPAL/SUPERVISORY LIABILITY:
## (DEFENDANT WELLPATH, DEFENDANT DR. NATOLE in his capacity as the Medical Director of the Muskegon County Jail, and DEFENDANT DAVID LOPEZ, LPN, in his capacity as the Health Services Administrator/Site Manager of the Medical Department of the Muskegon County Jail)

192.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

193.    Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, acted recklessly and/or with deliberate indifference when it practiced and/or permitted customs, policies, and/or practices that resulted in violations to Tiffany Davis' constitutional rights of citizens to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution.

194.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, refused to provide the employees and agents of Wellpath any training, discipline, and supervision with regard to the constitutional rights of detainees/inmates who suffer from serious medical needs, and to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution;

195.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, knew or should have known that the policies, procedures, training supervision and discipline of the employees and agents of Wellpath, were inadequate for the tasks that each Defendant was required to perform.

196.    At all times relevant, there was a complete failure to train, supervise and discipline the employees and agents of Wellpath, and the training, supervision and lack of discipline were so

reckless that future violations of the constitutional rights of detainees/inmates to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, as described in the preceding paragraphs, was certain to occur.

197.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, were on notice and knew that the failure of training, discipline and/or supervision of the employees and agents of Wellpath with regard to the constitutional rights of citizens to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, as described in the preceding paragraphs, was inadequate and would lead to the violation of detainees/inmates' constitutional rights.

198.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez', LPN, response to this knowledge was so inadequate as to show a complete disregard for whether the employees and agents of Wellpath would violate the constitutional rights of citizens to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution.

199.    Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, implicitly authorized, approved, or knowingly acquiesced in the deliberate indifference to the serious medical needs and cruel and unusual punishment of citizens.

200.    At all times relevant, there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, as described in the preceding paragraphs.

201.    At all times relevant, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, knew or should have known that there was a clear and persistent pattern of violations of citizens' constitutional rights to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, as described in the preceding paragraphs.

202.     Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, tolerated the employees' and agents' of Wellpath repeated violations of the 4th, 8th, and 14th Amendments to the United States Constitution, which allowed said employees and agents to continue to engage in this unlawful conduct.

203.     Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, refused to discipline the employees and agents of Wellpath who violated citizens' constitutional rights to be free from violations of the 4th, 8th, and 14th Amendments to the United States Constitution, failed to fully investigate allegations of misconduct, looked the other way, and thus, tacitly encouraged such behavior.  In doing so, Defendant Wellpath condoned, ratified, or encouraged said employees/agents to violate the 4th, 8th, and 14th Amendment to the United States Constitution as a matter of policy.

204.     Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, failed to adequately train, supervise, and/or discipline the agents of Wellpath in the years prior to and during the time of Tiffany Davis' death in the following ways, included but not limited to:

a.     Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in identifying when a detainee/inmate is experiencing a medical need and/or medical emergency and seeking the appropriate level of medical care (i.e.: calling 911) for an inmate/detainee such as Tiffany Davis who experienced symptoms including infection and seizures as illustrated in this matter in the above-stated facts when Defendant Medical Personnel chose not to call for appropriate medical care or 911 to treat Tiffany Davis at all relevant times;

b.     Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure in the proper medical charting when a detainee/inmate is experiencing a medical need and requires further monitoring by jail medical staff. Medical charts

are essential because they contain every medically relevant event to Tiffany Davis during her period of incarceration. The medical chart gives any medical personnel an understanding of everything that has occurred previously to the patient, allowing the medical personnel to make sound decisions based on the information in the chart. In this case, Defendant Medical Personnel either did not chart, charted insufficiently, or falsified information in the medical chart causing Tiffany Davis' serious medical condition to worsen and caused her to not receive appropriate medical care as illustrated in this matter in the above-stated facts;

c.      Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to identify severe and/or serious symptoms of untreated infection, and/or sepsis, and/or bleeding in the brain, and/or decerebrate posturing, and/or seizures, along with the many other neurological medical crisis symptoms as stated above, and to seek an appropriate level of medical care. This failure caused Tiffany Davis' serious medical condition to worsen and not receive appropriate medical care as illustrated in this matter in the above-stated facts as Defendant Medical Personnel either did not request a doctor's evaluation and/or assessment and/or did not send Tiffany Davis to the hospital promptly;

d.      Failure to adequately train and/or failure to follow proper policy, practice, and/or procedure to ensure that detainees/inmates receive timely treatment that adequately addresses their serious medical needs in an appropriate manner. As in this case, Tiffany Davis' serious medical need went untreated as she did not see a doctor, nor was she promptly sent to the hospital, causing a delay in treatment and her serious

medical condition to worsen, and ultimately causing her death as illustrated in the above-stated facts;

e.     Failure to adequately train or provide any type of initial training or ongoing training program for its medical personnel, including but not limited to training in providing medical care specifically in a jail setting, assessing, and treating medical conditions of detainees/inmates, monitoring, and recording inmate progress during/after medical issues, providing routine and/or emergency care to detainees/inmates in a jail, and a lack of feedback or regular evaluations in the jail setting. This lack of training caused Tiffany Davis' serious medical conditions to worsen, and ultimately led to her death as illustrated in the above-stated facts as Tiffany Davis contracted Streptococcus pneumoniae in the jail setting which caused her blood infection and/or sepsis, severe neurological crises, and ultimate death;

f.     Failing to supervise, review, and/or discipline medical personnel whom Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, knew or should have known were violating or were prone to violate citizens' constitutional rights, thereby permitting and/or encouraging its medical personnel to engage in such conduct as illustrated in the above-stated facts, i.e.: Defendant Dr. Natole, MD, Defendant Carleen Blanche, RN, Defendant Danielle Carlson, RN, Defendant David Lopez, LPN, Defendant Jessica Fairbanks, LPN, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, who were all previously involved in the unconstitutional deprivation of rights in the Paul Bulthouse matter, thereby permitting and/or encouraging its medical personnel to engage in such conduct;

g.      Failing to supervise its employees and/or agents with regard to the established policies, procedures, and rules as stated herein, and failing to discipline or reprimand its agents/employees who violated the established policies as stated herein. This lack of supervision and discipline thereby permitted and/or encouraged its medical personnel to engage in such conduct as illustrated in the above-stated facts;

h.      Otherwise failing to adequately train and/or follow proper policy, practice, or procedure resulting in the death of Tiffany Davis.

205.    The need for medical personnel to be trained in these areas was and remains obvious. Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez', LPN, failure to train the employees and/or agents of Wellpath as alleged in the preceding paragraph caused Tiffany Davis' pain, suffering, and death.  Less than one year prior to Tiffany Davis' death, Paul Bulthouse died in the care of Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, and its employees and/or agents at the Muskegon County Jail as a result of the failures described in the preceding paragraph, giving notice to these Defendants. These failures of Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, caused the death of Paul Bulthouse and subsequently, Tiffany Davis and constituted a clear and persistent pattern of misconduct through a custom of inaction.

206.    Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, further maintained customs, usages, and practices, which violated the constitutional rights of detainees/inmates, such as Tiffany Davis, including but not limited to:

a.      Maintaining a custom and/or policy allowing medical staff to submit inadequate/incomplete charting, including not charting anything for an interaction,

charting insufficiently, or falsifying information in the medical chart all causing Tiffany Davis' serious medical condition to worsen, as medical staff was not adequately informed, and caused her to not receive appropriate medical care as illustrated in the above-stated facts. This policy existed one year prior, when Wellpath, Dr. Natole and Defendant David Lopez, LPN, utilized the same policy/customs directly resulting in the death of Paul Bulthouse, as described above.;

b.    Maintaining a custom and/or policy that allows either an extensive delay in communication or no communication to the on-call doctor from the nursing staff and/or their records/observations of an inmate who has an acute, serious medical emergency or on going serious medical condition. This delay/lack of communication policy caused the death of Paul Bulthouse, where he had numerous days of withdrawal symptoms and seizures with no meaningful communication to the on-call doctor for Paul Bulthouse to either be treated or be sent to the hospital for the seizures he experienced. *Bulthouse v. County of Muskegon et al.*, 21cv00281 (W.D. Mich. 2021). This same delay/lack of communication resulted in Tiffany Davis' lack of medical treatment, as described above;

c.    Maintaining a custom and/or policy where the on-call doctor receives information from a subordinate medical personnel that a detainee/inmate is experiencing a serious medical condition, and that on-call doctor does not follow up on the status of that detainee/inmate, does not physically assess, does not order a treatment plan, does not order a follow up examination, does not order laboratory testing, provides no communication with subordinates to effectively treat the detainee/inmate, and does not order emergency care. Defendant Dr. Natole, after receiving information

regarding a serious medical condition that was provided to him by Defendant Heather Ihrig, as it relates to Tiffany Davis' serious medical condition and symptoms, (i.e.: seizures) on February 18, 2020, did not follow up on the status of Tiffany Davis, did not physically assess her, did not order a treatment plan, did not order a follow up examination, did not order laboratory testing, had minimal/inadequate communication to effectively treat Tiffany Davis, and did not order emergency care. Defendant Dr. Natole was told of Tiffany Davis' serious medical conditions by Defendant Heather Ihrig, and failed to act other than to prescribe headache and nausea medication for an undiagnosed condition. This policy existed one year prior, when Wellpath, Dr. Natole and Defendant David Lopez, LPN, utilized the same policy/customs directly resulting in the death of Paul Bulthouse, as described above.

d.   Maintaining a custom and/or policy that allows medical personnel to delay treatment to detainees/inmates who suffer from infections, sepsis, seizures and/or neurological crises, such as Tiffany Davis, by utilizing a wait-and-see approach for treatment, as described above by Defendant Carleen Blanche, RN. The wait-and-see policy involves allowing an inmate to progress with an illness until they are on their death bed and die, are taken to a hospital when the condition is irreversible, or to somehow be magically cured with inadequate or no medical treatment. This policy continues to be promoted and utilized by Wellpath and its employees in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. This policy is the direct cause for the death of Tiffany Davis as illustrated in the above-stated facts. This policy existed one year prior, when

Wellpath utilized the same policy/customs directly resulting in the death of Paul Bulthouse, as described above.

e.    Maintaining a custom and/or policy to not obtain various laboratory testing for detainees/inmates who exhibit obvious symptoms of a serious medical condition, (i.e.: infection) so that the scope of and responsibility for medical treatment is not expanded. Medical personnel purposely fail to complete or request laboratory testing in order to actively turn a blind eye to avoid being obligated to treat a condition that would be identified by the lab work, as described above by Defendant Carleen Blanche, RN. This custom and policy contributed to Tiffany Davis' death, as a blood laboratory test was not ordered and would have identified her infection early. This policy continues to be promoted and utilized by Wellpath and its employees in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. This policy led to the death of Tiffany Davis. This policy existed one year prior, when Wellpath utilized the same policy/customs leading to the death of Paul Bulthouse, as described above;

f.    Maintaining a custom and/or policy of utilizing a deputy instead of a trained jail medical personnel, to solely monitor detainees/inmates via the live video feed, who are experiencing serious medical conditions, such as seizures, neurological crises, sepsis, and/or infection as stated above, and that may require immediate emergency care. Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, rely on non-medically trained deputies to monitor a patient such as Tiffany Davis, who was placed in a holding cell for "medical observation," but no jail medical personnel are constantly observing her via a live video monitor. This policy

risks denying or delaying necessary treatment and creates a risk of serious harm or death to an inmate such as Tiffany Davis as illustrated above. This policy existed one year prior, when Wellpath utilized the same policy/customs leading to the death of Paul Bulthouse;

g.      Maintaining a custom and/or policy to allow detainees/inmates who experience seizure activity and/or emergency neurological events to not be timely assessed by a physician at the jail or transferred to a hospital. This custom/policy allows medical conditions to worsen, causing more pain, suffering, and eventually death as illustrated in this case. As of the time of Tiffany Davis' pretrial detention and/or incarceration, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, were put on notice of its failure to have a physician complete an assessment and adequate treatment plan in a timely manner when a detainee/inmate experiences signs and symptoms of seizures, resulting in the death of Paul Bulthouse, as described above;

h.      Maintaining a custom and/or policy to allow detainees/inmates who experience a serious medical condition (that would be obvious to a layperson) to not be timely assessed by a physician at the jail or transferred to a hospital. This custom/policy allows medical conditions to worsen, causing more pain, suffering, and eventually death as illustrated in this case. As of the time of Tiffany Davis' pretrial detention and/or incarceration, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, were put on notice of its failure to have a physician complete an assessment and adequate treatment plan when a detainee/inmate experiences a serious medical condition, and at times resulting in death of the inmate. *Bulthouse*

*v. County of Muskegon et al*., 21cv00281 (W.D. Mich. 2021)*; McKinley v. Muskegon County, et al., 14cv00840 (*W.D. Mich. 2014*); Semelbauer v. Muskegon County, et al, 14cv01245 (*W.D. Mich. 2014*);*

i.      Maintaining a custom and/or policy authorizing under-credentialed medical personnel to inappropriately oversee and/or supervise medical personnel which is not adequate to ensure that detainees/inmates receive medical care in accordance with their constitutional rights, as occurred in this case (i.e.: lack of medical doctor or registered nurse supervision over less-credentialed medical personnel) when there was either no medical doctor or registered nurse present supervising LPN, EMT, or medical assistants that assisted Tiffany Davis;

j.      Maintaining a custom and/or policy of routinely minimizing detainees/inmates experiencing life-threatening medical symptoms, such as seizures, as malingerers, or "faking" or "factitious" without proper follow-up medical care to prove or disprove the belief. This custom/policy led to medical personnel casting unnecessary doubt on Tiffany Davis' serious medical condition without any meaningful assessment, allowing the conditions to worsen, causing more pain, suffering, and eventually death as illustrated in this case. As of the time of Tiffany Davis' pretrial detention and/or incarceration, Defendant Wellpath was put on notice of its employees and/or agents deeming life-threatening medical conditions, such as recurring seizures, as "factitious" by various deputies, Defendant Dr. Natole, and other employees/agents of Wellpath, which led to the death of Paul Bulthouse.

207.   These unconstitutional policies existed one year prior, when Defendant Wellpath utilized the same policy/customs directly resulting in the death of Paul Bulthouse, as described above.

208.   Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, have engaged in a pattern or practice or custom of unconstitutional conduct toward confined persons such as Tiffany Davis with serious medical needs. This included a pattern, practice, or custom of not providing medical care, or emergency care when necessary, on a timely basis, so as to alleviate an inmate's unnecessary pain. This included a pattern, practice, or custom of not securing medical care for detainees/inmates who are suffering from untreated infection/sepsis and/or bleeding in the brain, which resulted due to the lack of diagnosis, treatment, and monitoring of Tiffany Davis' severe headaches, vomiting, fever, disorientation, dilated pupils, decerebrate posturing, and seizures, along with the many other neurological medical crisis symptoms as stated above;

209.   Tiffany Davis' injuries in this case were proximately caused by policies and practices of Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, which by their deliberate indifference, allows their agents and employees to violate the constitutional rights of citizens without fear of any meaningful investigation or punishment.  In this way, Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, violated Tiffany Davis' rights since they created the opportunity for Defendant Medical Personnel to commit the foregoing constitutional violations.

210.   The misconduct described in preceding paragraphs has become a widespread practice, and so well settled as to constitute *de facto* policy for Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN.  This policy was able to exist and thrive because

governmental policymakers have exhibited deliberate indifference to the problem, thereby ratifying it.

211.    The widespread practice described in preceding paragraphs was allowed to flourish because Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, have declined to implement sufficient hiring, training and/or legitimate and/or effective mechanisms for oversight and/or punishment of misconduct.

212.    The policies and practices of Defendant Wellpath, Defendant Dr. Natole, and Defendant David Lopez, LPN, directly and proximately led to the injuries and death that Tiffany Davis suffered at the hands of Defendant Medical Personnel.

213.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.      Death;

b.      Reasonable medical, hospital, funeral and burial expenses;

c.      Conscious pain and suffering, physical and emotional;

d.      Humiliation and/or mortification;

e.      Mental anguish;

f.      Economic damages;

g.      Loss of love, society, and companionship;

h.      Loss of gifts, gratuities, and other items of economic value;

i.      Parental and spousal guidance, training, and support;

j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.      Attorney fees and costs pursuant to 42 USC § 1988;

l.      Any and all other damages otherwise recoverable under federal law and the

Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in

her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-

Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive

and exemplary damages.

### COUNT VII:
### STATE LAW CLAIMS OF
### GROSS NEGLIGENCE, AND/OR WANTON AND WILLFUL MISCONDUCT
### (ALL DEFENDANTS)

214.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint

as if fully set forth herein.

215.    That in taking custody of Tiffany Davis, all Defendants undertook and owed a duty

to her to make reasonable efforts to care for her in a reasonable and prudent manner, to exercise

due care and caution, and in such operation as the rules of the common law require, and in

accordance with the customs, policies, and procedures.

216.    That all Defendants breached each and every duty owed to Tiffany Davis.

217.    That notwithstanding the aforementioned duties, the aforementioned Defendants

took into custody, incarcerated, and monitored Tiffany Davis in an extremely careless, grossly

negligent, reckless, and wanton and willful manner without concern whatsoever for her safety and

welfare, and failed to tend to her serious medical needs, including, but not limited to, the following

particulars by way of illustration and not limitation:

a.      Failing to request or delay in requesting emergency medical treatment during, after

being notified, and/or observing that Tiffany Davis was suffering from seizures, or

from the many symptoms of a bacterial infection, inclusive of headache, severe

pain, nausea, vomiting, involuntary movements, and photophobia, decerebrate posturing, tremors, confusion, dizziness, lack of balance, hypertension, fever, tachycardia, not being alert or oriented, not responding to verbal commands or painful stimulation, dilated pupils, agitation, severe frontal lobe head pain, and an abnormal urinalysis result (with negative drug toxicology and negative pregnancy results);

b. Being deliberately indifferent to Tiffany Davis' serious medical needs as described above that were obvious to a lay person and providing no medical treatment or causing a delay in medical treatment;

c. Providing a medical response to Tiffany Davis' serious medical needs that was so inadequate that it was patently unreasonable;

d. Failing to observe and check on Tiffany Davis as she exhibited numerous serious medical needs and was in distress;

e. Consciously exposing Tiffany Davis to an excessive risk of serious harm;

f. Ignoring requests to provide Tiffany Davis with the needed medical treatment;

g. Failing to request and delaying medical attention when it was apparent that Tiffany Davis was unresponsive or her medical conditions / symptoms were deteriorating even after being medically assessed, or where Defendant Deputies and Defendant Medical Personnel had reason to believe that the prior medical assessment of Tiffany Davis' condition was not reliable;

h. Failing to determine if Tiffany Davis was malingering with constant monitoring in the face of her worsening condition;

i. Failing to transfer Tiffany Davis to the hospital for treatment, monitoring, observation, and supportive measures;

j.   Placing Tiffany Davis in a holding cell, and failing to adequately observe and/or monitor her, notwithstanding her known serious medical needs;

k.   Failing to perform necessary jail cell checks and observations;

l.   Delaying necessary medical treatment for a serious medical need after symptoms worsened after medical evaluations were conducted;

m.   Failing to properly train and supervise the individuals within the Muskegon County Jail having custodial and/or caregiving responsibilities over Tiffany Davis, to ensure her serious medical needs were timely and properly tended to, and to ensure the above breaches/deviations were not committed.

218.   That the above-described actions and/or inactions violated MCL 691.1407 in that they amounted to gross negligence, specifically conduct so reckless as to demonstrate a substantial disregard for whether an injury resulted to the Tiffany Davis.

219.   That Defendants are not entitled to governmental immunity based upon their actions.

220.   That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.   Death;

b.   Reasonable medical, hospital, funeral and burial expenses;

c.   Conscious pain and suffering, physical and emotional;

d.   Humiliation and/or mortification;

e.   Mental anguish;

f.   Economic damages;

g.   Loss of love, society, and companionship;

h.      Loss of gifts, gratuities, and other items of economic value;

i.       Parental and spousal guidance, training, and support;

j.       Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.      Attorney fees and costs if applicable;

l.       Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT VIII:
## MEDICAL MALPRACTICE/NEGLIGENCE/GROSS NEGLIGENCE
## (DEFENDANT DR. JOSEPH NATOLE, MD)

221.    Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

222.    In treating Tiffany Davis, Defendant Dr. Natole was required to provide the recognized standard of practice or care within his specialty as a Family Practice Physician and was required to render care as a reasonable and prudent physician board certified and specializing in Family Practice Physician. (The Affidavit of Merit of Grant Phillips, MD is attached hereto).

223.    The applicable standard of practice/care required that Defendant Dr. Natole timely and appropriately do all of the following, which he failed to do, and is, therefore, professionally negligent:

a.    Exercise that degree of reasonable medical judgment and provide appropriate medical care that a reasonable family medicine practitioner would under same or similar circumstances;

b.    Be familiar with and comply with national and facility guidelines, pathways and protocols, and peer-reviewed research that are applicable to patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

c.    Timely and appropriately complete an examination and assessment of a patient's medical history, including any history of substance use disorder and neurological conditions, and document medications prescribed, to safely and effectively treat medical disorders, monitor basic patient health such as vital signs and overall condition, and provide medications for patients that present with and/or exhibit signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, and timely/accurately record all information;

d.      Timely and appropriately recognize that patients who have a history of substance use disorders that suffer from one or a combination of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, and tachycardia, are at greater risk for complications thus mandating closer monitoring by appropriately trained medical and/or nursing personnel;

e.      Timely and appropriately provide medications, medical assessments, medical examinations, treatment, and ongoing monitoring in treating patients who suffer from neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

f.      Timely and appropriately recognize that a patient's symptoms and signs of one or more of the following, including neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use

102

disorder, require a higher level of care, hospitalization and provide immediate hospitalization;

g.      Timely and appropriately report a patient to an acute emergency care department, and provide a patient, who was exhibiting neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, a targeted physical examination that includes checking vital signs, assessing cardiovascular, neurologic, pain, and mental health statuses, evaluate all assessments, develop a treatment plan, order laboratory evaluations including a blood count, comprehensive serum chemistry panel, blood/urine testing for bacteria/sepsis, urine toxicology, viral hepatitis panel, and screening for HIV when needed, and evaluate all laboratory results;

h.      Ensure that the properly licensed and trained healthcare personnel perform an examination and develop an assessment and treatment plan of a patient exhibiting neurological symptoms and suffering from serious medical conditions such as neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

i.      Timely and appropriately recognize that patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder are at high risk for life-threatening events if not properly managed by a qualified physician or hospital emergency department, and provide the necessary treatment and/or immediate hospitalization;

j.      Timely and appropriately have medical equipment (i.e.: a thermometer) needed, and available for patient assessments and examinations;

k.      Timely and adequately perform, or supervise while properly trained medical and/or nursing personnel perform, an examination and develop an assessment and treatment plan of a patient exhibiting neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

l.      Timely and adequately provide appropriate medical care, monitoring, and treatment for a patient who is suffering from a neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity,

decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

m.   Perform timely and accurate comprehensive examinations and assessments of the patient and appreciate a thorough history to assess her risk for neurological conditions and/or seizures when a patient experiences seizures/shaking activity and no history is provided for previous seizures or neurological disorders;

n.   Keep apprised of the patient's status and changes in their condition after observing directly or learning that she was experiencing and/or continuing to experience symptoms associated with neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

o.   Timely and appropriately recognize and diagnose that a patient is experiencing a serious medical condition in the form of neurological changes and provide proper treatment, medications, and hospitalization;

p.   Timely and appropriately recognize and diagnose that a patient is experiencing a serious medical condition in the form of neurological changes and ensure that the patient undergoes medical treatment and hospitalization for this urgent and

potentially life-threatening medical condition;

q.      Keep apprised of the patient's status and changes in their medical condition after observing that the patient was experiencing neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, and/or tachycardia, that may not have been associated with substance use or a substance disorder and no history is provided for previous neurological disorders;

r.      Timely and appropriately follow the national and state standards for evaluating individuals with signs and/or symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

s.      Have a properly trained nursing supervisor, with the proper credential of a Registered Nurse, in the supervisory position.  According to the Michigan Civil Service Commission, Jobs Specification for Practical Nurse Licensed states: "Employees in this job provide skilled nursing services to patients in state mental health facilities (psychiatric hospitals or centers for the developmentally disabled), public health facilities (veterans' hospitals) and correctional facilities (prisons),

under the direction of a professional Registered Nurse or medical doctor, and provide a variety of related services to maintain a safe, therapeutic environment."

t.      Properly supervise any nurse, nursing personnel, emergency medical personnel, or medical assistant, ensuring they adequately treat a patient suffering from neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

u.      Perform timely and accurate comprehensive physical re-assessments and re-examinations of the patient to reassess for neurological medical conditions when patient's signs and symptoms appear to stay the same or worsen over a period of time;

v.      Recognize, communicate, and advocate the need and urgency of timely administering appropriate treatments, medications, and transfer to a higher level of care, including immediate hospitalization

w.      Maintain awareness, closely supervise a patient's status and intervene in to provide requisite and appropriate care for any changes in their condition after observing that the patient was experiencing symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or

answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

x.     Other acts of professional negligence yet to be determined.

224.   At all times relevant to the care and treatment of Tiffany Davis, Defendant Dr. Natole, failed in all respects to comply with the applicable standard of care and was, therefore, professionally negligent in his care and treatment of Decedent.

225.   The above breaches of the standard of care by Defendant Dr. Natole were the proximate cause of Tiffany Davis' untreated infection/sepsis and/or bleeding in the brain, which resulted due to the lack of diagnosis, treatment, and monitoring of Tiffany Davis' severe headaches, vomiting, fever, disorientation, dilated pupils, decerebrate posturing, and seizures, along with the many other neurological medical crisis symptoms as stated above;

226.   The above breaches of the standard of care by Defendant Dr. Natole were the proximate cause of Tiffany Davis' pain, suffering and subsequent death.

227.   That as a further consequence of the negligence described above, Plaintiff's decedent Tiffany Davis, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as she is entitled under the Wrongful Death Act, MCL 600.2922.

228.   Defendant Joseph Natole, Jr., M.D. P.C. through his agents and employees, including but not limited to, Defendant Dr. Joseph Natole, MD, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

229.    Defendant Wellpath, through his agents and employees, including but not limited to Defendant Dr. Joseph Natole, MD, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

230.    Defendant Muskegon County through its agents and employees, upon information and belief, including but not limited to, Defendant Dr. Joseph Natole, MD, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

231.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Dr. Natole.

232.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Dr. Natole.

233.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.      Loss of gifts, gratuities, and other items of economic value;

i.      Parental and spousal guidance, training, and support;

j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.      Attorney fees and costs if applicable;

l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

**COUNT IX:**
**MEDICAL MALPRACTICE/NEGLIGENCE/GROSS NEGLIGENCE**
**(DEFENDANT CARLEEN BLANCHE, RN, and**
**DEFENDANT DANIELLE CARLSON, RN)**

234.    Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

235.    In treating Tiffany Davis, Defendant Carleen Blanche, RN, and Defendant Danielle Carlson, RN, were required to provide the recognized standard of practice or care within their specialty as a registered nurse and were required to render care as a reasonable and prudent registered nurse of average training, experience and education under the same or similar clinical circumstances as pertains to Tiffany Davis as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, pertaining to

their rendering care to Plaintiff's decedent Tiffany Davis. (The Affidavit of Merit of Denise Panosky, RN, is attached hereto)

236.     The applicable standard of practice/care required that Defendant Carleen Blanche, RN, and Defendant Danielle Carlson, RN, timely and appropriately do all of the following, which they failed to do, and are, therefore, professionally negligent:

a.     Exercise that degree of reasonable judgment and provide appropriate care that a reasonable registered nurse would under same or similar circumstances;

b.     Be familiar with and comply with national and facility guidelines, pathways and protocols, and peer-reviewed research that are applicable to patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

c.     Appreciate the scope of practice of that of a registered nurse, recognize and understand the services that a qualified registered nurse is deemed competent to perform, and permitted to undertake, and abide by all rules and regulations regarding scope of practice issued by the professional licensing agency for that of a registered nurse;

d.     Timely and appropriately complete an assessment of a patient, including any history of substance use disorder and neurological conditions, and document medications prescribed, and timely/accurately recording all patient information, to

safely and effectively treat medical disorders, monitor basic patient health such as vital signs and overall condition, and provide medications for patients that present with and/or exhibit signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

e.     Timely and appropriately recognize that patients who have a history of substance use disorders that suffer from one or a combination of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension and tachycardia, are at greater risk for complications thus mandating closer monitoring by appropriately trained medical and/or nursing personnel;

f.     Timely and appropriately provide medications, assessments, treatment, and ongoing monitoring in treating patients who suffer from neurological disorder, head/brain injury, seizures, hypertension, tachycardia, and/or substance use disorder who exhibit signs and/or symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance,

photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

g.  Timely and appropriately recognize that a patient's symptoms and signs of one or more of the following, including neurological disorder, head/brain injury, seizures, hypertension, tachycardia, and/or substance use disorder who exhibit signs and/or symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, require a higher level of care, hospitalization and provide immediate hospitalization;

h.  Timely and appropriately refer a patient for a medical evaluation/examination with a physician;

i.  Timely and appropriately report a patient to a physician or an acute emergency care department, and provide that patient, who is exhibiting signs and/or symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, a targeted physical

113

assessment that includes checking vital signs, assessing cardiovascular, neurologic, pain, and mental health statuses and obtaining laboratory evaluations when needed;

j.    Develop an assessment and treatment plan for a patient exhibiting neurologic symptoms including neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

k.    Timely and appropriately recognize that patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder are at high risk for life-threatening events if not properly managed by a physician or hospital emergency department, and report such to a qualified physician or medical/nursing personnel, and provide the necessary treatment;

l.    Timely and appropriately perform an examination and develop an assessment and treatment plan of a patient exhibiting neurological symptoms and suffering from a serious medical condition such as neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia,

abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, with a physician;

m.    Timely and appropriately have medical equipment (i.e.: a thermometer) needed, and available for patient assessments;

n.    Timely and adequately provide appropriate nursing care, monitoring, and treatment for a patient who is suffering from neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

o.    Perform timely and accurate comprehensive assessments and appreciate a thorough history of the patient to assess her risk for neurological conditions and/or seizures when a patient experiences and/or continues to experience seizures/shaking activity, and no medical history is provided for previous seizures or neurological disorders;

p.    Keep apprised of the patient's status and changes in their condition after observing directly or having knowledge that she was experiencing symptoms associated with neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results,

fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

q.     Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, and that such a condition can be life threatening if not properly managed by a qualified physician and/or immediate hospitalization;

r.     Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of neurological changes and provide proper treatment, medications, and hospitalization;

s.     Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of neurological changes and ensure that the patient undergoes medical treatment and hospitalization for this urgent and potentially life-threatening medical condition;

t.     Keep apprised of the patient's status and changes in their medical condition after observing that the patient was experiencing neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion,

delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, and no history is provided for previous neurological disorders;

u.     Timely and appropriately follow the national and state standards for evaluating individuals with signs and/or symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

v.     Properly supervise any nurse, nursing personnel, or EMT, ensuring they adequately treat a patient suffering from neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

w.    Have a properly trained nursing supervisor, with the proper credential of a Registered Nurse, in the supervisory position.  According to the Michigan Civil Service Commission, Jobs Specification for Practical Nurse Licensed states: "Employees in this job provide skilled nursing services to patients in state mental health facilities (psychiatric hospitals or centers for the developmentally disabled),

117

public health facilities (veterans' hospitals) and correctional facilities (prisons), under the direction of a professional Registered Nurse or medical doctor, and provide a variety of related services to maintain a safe, therapeutic environment.";

x.    Timely collaborate with appropriate physicians and clinicians, including mental health, to establish optimal treatment plans and to achieve favorable patient outcomes;

y.    Recognize, communicate, and advocate the need and urgency of timely administering appropriate treatments, medications, and transfer to a higher level of care, including immediate hospitalization;

z.    Recognize, communicate, and advocate the need and urgency of timely performing interventions for a patient experiencing neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

aa.   Recognize, communicate, and advocate the need and urgency of immediate hospitalization and/or immediate physician medical treatment for a patient experiencing neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness,

hypertension, tachycardia, and/or substance use disorder;

bb.    Perform timely and accurate comprehensive physical re-assessments of the patient to reassess for neurological medical conditions when patient's signs and symptoms appear to stay the same or worsen over a period of time;

cc.    Maintain awareness, closely supervise a patient's status, and intervene to provide requisite and appropriate care for any changes in condition after observing that the patient was experiencing symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

dd.    Other acts of professional negligence yet to be determined.

237.    At all times relevant to the care and treatment of Tiffany Davis, Defendant Carleen Blanche, RN, and Defendant Danielle Carlson, RN, failed in all respects to comply with the applicable standard of care and were, therefore, professionally negligent in the care and treatment of Decedent.

238.    The above breaches of the standard of care by Defendant Carleen Blanche, RN, and Defendant Danielle Carlson, RN, were the proximate cause of Tiffany Davis' untreated infection/sepsis and/or bleeding in the brain, which resulted due to the lack of diagnosis, treatment, and monitoring of Tiffany Davis' severe headaches, vomiting, fever, disorientation, dilated pupils, decerebrate posturing, and seizures, along with the many other neurological medical crisis symptoms as stated above;

239.    The above breaches of the standard of care by Defendant Carleen Blanche, RN, and Defendant Danielle Carlson, RN, were the proximate cause of Tiffany Davis' pain, suffering and subsequent death.

240.    That as a further consequence of the negligence described above, Plaintiff's decedent Tiffany Davis, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as she is entitled under the Wrongful Death Act, MCL 600.2922.

241.    Defendant Wellpath, through its agents and employees, including but not limited to, Defendant Carleen Blanche, RN, and Defendant Danielle Carlson, RN, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

242.    Defendant Muskegon County through its agents and employees, upon information and belief including but not limited to, Defendant Carleen Blanche, RN, and Defendant Danielle Carlson, RN, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

243.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Carleen Blanche, RN, and Defendant Danielle Carlson, RN.

244.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Carleen Blanche, RN, and Defendant Danielle Carlson, RN.

245.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs if applicable;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-

Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT X:
## MEDICAL MALPRACTICE/NEGLIGENCE/GROSS NEGLIGENCE
## (DEFENDANT JESSICA FAIRBANKS, LPN, DEFENDANT KATY CASTILLO, LPN, and DEFENDANT DAVID LOPEZ, LPN)

246.    Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

247.    In treating Tiffany Davis, Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, and Defendant David Lopez, LPN were required to provide the recognized standard of practice or care within their specialty as a licensed practical nurse and were required to render care as a reasonable and prudent licensed practical nurse of average training, experience and education under the same or similar clinical circumstances as pertains to Tiffany Davis as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, pertaining to their rendering care to Plaintiff's decedent Tiffany Davis. (The Affidavit of Merit of Denise Panosky, RN, is attached hereto)

248.    The applicable standard of practice/care required that Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, and Defendant David Lopez, LPN, timely and appropriately do all of the following, which they failed to do, and are therefore, professionally negligent:

a.      Exercise that degree of reasonable judgment and provide appropriate care that a reasonable licensed practical nurse would under same or similar circumstances;

b.      Be familiar with and comply with national and facility guidelines, pathways, and protocols that are applicable to patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing,

sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

c.     Appreciate the scope of practice of that of a licensed practical nurse, recognize and understand the services that a qualified licensed practical nurse is deemed competent to perform, and permitted to undertake, and abide by all rules and regulations regarding scope of practice issued by the professional licensing agency for that of a licensed practical nurse;

d.     Timely and appropriately observe and accurately record an accurate patient medical history, including any history of substance use disorder and neurological conditions, document all medications prescribed, monitor basic patient health such as vital signs and overall condition, and provide prescribed medications for patients that present with and/or exhibit signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

e.     Timely and appropriately recognize that patients who have a history of substance use disorders that suffer from one or a combination of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of

balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, and tachycardia, are at greater risk for complications thus mandating closer monitoring by appropriately trained medical and/or nursing personnel, and timely inform proper personnel;

f.      Timely and appropriately provide treatment, medications, and ongoing monitoring in patients who suffer from neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

g.      Timely and appropriately recognize that a patient's symptoms and signs of one or more of the following, including neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, require a higher level of care, hospitalization, and immediately report such observations to medical or nursing staff;

h.      Timely and appropriately refer a patient for a medical examination and/or nursing assessment when a patient exhibits signs and/or symptoms of neurological disorder,

head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

i.   Timely and appropriately report to nursing or medical staff a patient who was exhibiting signs of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder.  Monitor their vital signs, evaluate the wellbeing of patient, monitor neurologic condition, pain, mental health, and cardiovascular status, accurately record all observations in patient  records, and obtain or request that a qualified nurse/medical personnel obtain patient evaluation.;

j.   Follow the plan for a patient exhibiting neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

k.      Timely and appropriately recognize that patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder are at high risk for life-threatening events if not properly managed by a physician or hospital emergency department, and report such to a physician or qualified medical/nursing personnel;

l.      Timely and adequately provide appropriate care and monitoring for a patient exhibiting of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, thoroughly and accurately record and document all observations, and report to nurse or physician;

m.      Timely and appropriately have proper medical equipment (i.e.: a thermometer) needed, and available for patient care and monitoring;

n.      Observe and report to nursing/medical staff a patient's risk for neurological medical conditions and appreciate a thorough history when directly observing or learning that a patient is experiencing seizures/shaking activity, when no medical history was provided for previous seizures or neurological disorders;

o.      Keep apprised of the patient's status, condition, and changes in condition,

accurately record such in patient's chart, and report to nursing/medical staff after observing that patient was experiencing and/or continuing to experience symptoms associated with of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

p.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, and that such a condition can be life threatening if not properly managed by a qualified physician and/or immediate hospitalization;

q.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of neurological changes and provide proper treatment, medications, and hospitalization;

r.  Timely and appropriately recognize that a patient is experiencing a serious medical condition in the form of neurological changes and ensure that the patient undergoes medical treatment and hospitalization for this urgent and potentially life-threatening medical condition;

127

s.      Keep apprised of the patient's status, condition, and changes in their medical condition after observing that the patient was experiencing of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder that may not have been associated with substance use or a substance disorder and no history is provided for previous neurological disorders;

t.      Timely and appropriately follow the national and state standards for evaluating individuals with signs and/or symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

u.      Recognize, communicate, and advocate the need and urgency of timely administering appropriate treatments, medications, and transfer to a higher level of care, including immediate hospitalization;

v.      Recognize, communicate, and advocate the need and urgency of timely performing interventions for a patient experiencing of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia,

abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

w.     Have a properly trained nursing supervisor, with the proper credential of a Registered Nurse, in the supervisory position.  According to the Michigan Civil Service Commission, Jobs Specification for Practical Nurse Licensed states: "Employees in this job provide skilled nursing services to patients in state mental health facilities (psychiatric hospitals or centers for the developmentally disabled), public health facilities (veterans' hospitals) and correctional facilities (prisons), under the direction of a professional Registered Nurse or medical doctor, and provide a variety of related services to maintain a safe, therapeutic environment.";

x.     Recognize, communicate, and advocate the need and urgency of immediate hospitalization and/or immediate physician medical treatment for neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

y.     Timely and appropriately record all observations and patient status, and report to proper medical and/or nursing personnel for every observation that a patient's signs and symptoms appear to stay the same or worsen over a period of time in order for patient to be reexamined and reassessed by proper personnel;

z.      Maintain awareness, closely supervise a patient's status, and intervene in to provide requisite and appropriate care for any changes in their condition after observing that the patient was experiencing symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

aa.     Other acts of professional negligence yet to be determined.

249.    At all times relevant to the care and treatment of Tiffany Davis, Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, and Defendant David Lopez, LPN, failed in all respects to comply with the applicable standard of care and were, therefore, professionally negligent in the care and treatment of Decedent.

250.    The above breaches of the standard of care by Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, and Defendant David Lopez, LPN, were the proximate cause of Tiffany Davis' untreated infection/sepsis and/or bleeding in the brain, which resulted due to the lack of diagnosis, treatment, and monitoring of Tiffany Davis' severe headaches, vomiting, fever, disorientation, dilated pupils, decerebrate posturing, and seizures, along with the many other neurological medical crisis symptoms as stated above.

251.    The above breaches of the standard of care by Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, and Defendant David Lopez, LPN, were the proximate cause of Tiffany Davis' pain, suffering and subsequent death.

252.    That as a further consequence of the negligence described above, Plaintiff's decedent Tiffany Davis, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as she is entitled under the Wrongful Death Act, MCL 600.2922.

253.    Defendant Wellpath, through its agents and employees, including but not limited to, Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, and Defendant David Lopez, LPN, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

254.    Defendant Muskegon County through its agents and employees, upon information and belief including but not limited to, Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, and Defendant David Lopez, LPN, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

255.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, and Defendant David Lopez, LPN.

256.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Jessica Fairbanks, LPN, Defendant Katy Castillo, LPN, and Defendant David Lopez, LPN.

257.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs if applicable;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

**COUNT XI:**
**MEDICAL MALPRACTICE/NEGLIGENCE/GROSS NEGLIGENCE**
**(DEFENDANT BRITNI BRINKMAN, EMT, and DEFENDANT SARA BRUCE, EMT)**

258.     Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

259.     In treating Tiffany Davis, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, were required to provide the recognized standard of practice or care within their specialty as an Emergency Medical Technician and were required to render care as a reasonable and prudent emergency medical technician of average training, experience and education under the same or similar clinical circumstances as pertains to Tiffany Davis as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, pertaining to their rendering care to Plaintiff's decedent Tiffany Davis. (The Affidavit of Merit of John Everlove, BA, NRP is attached hereto)

260.     The applicable standard of practice/care required that Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, timely and appropriately do all of the following, which they failed to do, and are, therefore, professionally negligent:

a.     Exercise that degree of reasonable medical judgment and provide appropriate medical care that a reasonable emergency medical technician would under same or similar circumstances;

b.     Be familiar with and comply with national, state, and local policies, procedures, and protocols, and facility guidelines, pathways and protocols, and peer-reviewed research that are applicable to patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory

133

results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

c.  Appreciate the scope of practice of that of an emergency medical technician, recognize and understand the services that a qualified emergency medical technician is deemed competent to perform, and permitted to undertake, and abide by all rules and regulations regarding scope of practice issued by the professional licensing agency for that of an emergency medical technician;

d.  Timely and appropriately perform a primary and secondary assessment of an emergent medical patient with a life-threatening condition;

e.  Timely and appropriately complete an assessment of a patient's past and/or pertinent medical history, including substance use disorder and neurological conditions, monitor basic patient health such as vital signs and overall condition, and medications prescribed to safely and effectively treat medical disorders for patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, record accurately in patient file;

f.  Timely and appropriately recognize that patients who have a history of substance use disorders that suffer from one or a combination of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements,

134

seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder are at greater risk for complications thus mandating closer monitoring by appropriately trained medical and/or nursing personnel, and require emergent treatment and transportation to the hospital for definitive medical care;

g.      Timely and appropriately provide medications, medical assessments, treatment, and ongoing monitoring in patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

h.      Timely and appropriately recognize that a patient's symptoms and signs of one or more of the following, including neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, require emergency medical treatment, transportation, and hospitalization, and provide immediate emergency medical care and hospitalization;

i.    Timely and appropriately provide an evaluation of patient and/or refer to trained medical personnel or an acute emergency care department to determine the appropriate and indicated treatment for the patient;

j.    Timely and appropriately report to a physician and/or provide a patient presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, a targeted physical examination that includes a primary assessment, a secondary assessment, medical interventions and treatment, assessment of a patient's vital signs and an evaluation of the cardiovascular system, neurological system, respiratory system and mental health alertness and orientation; and provide, obtain or request that a qualified nurse/medical personnel obtain laboratory evaluations including blood count, comprehensive serum chemistry panel, blood/urine testing for bacteria/sepsis, urine toxicology, viral hepatitis panel, and screening for HIV when needed;

k.    Develop an assessment and plan for a patient exhibiting neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or

136

substance use disorder;

l.      Timely and appropriately recognize that patients presenting and/or exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder are at high risk for life-threatening events if not properly managed by a physician or hospital emergency department, and report such to a physician or qualified medical/nursing personnel, and provide the necessary treatment.

m.     Ensure that the properly licensed and trained medical personnel perform an examination and develop an assessment and treatment plan of a patient exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

n.      Timely and adequately perform an examination and develop an assessment and treatment plan of a patient exhibiting neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium,

disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder with a properly licensed physician or nurse;

o.      Perform timely and accurate comprehensive examinations and assessments of the patient and appreciate a thorough history to assess her risk for neurological conditions and/or seizures when a patient experiences seizure activity/shaking and no history is provided for previous neurological disorders;

p.      Timely and appropriately have all requisite medical equipment (i.e.: thermometer) needed, and available for patient examinations and assessments;

q.      Timely and adequately provide appropriate care, monitoring, and treatment for a patient who is suffering from neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

r.      Perform timely and accurate comprehensive physical re-assessments and re-examinations of the patient to reassess for neurological medical conditions when patient's signs and symptoms appear to stay the same or worsen over a period of time;

s.      Keep apprised of the patient's status, condition, and changes in their condition, accurately record in chart, and report status to properly licensed and trained nursing/medical staff after observing that patient was experiencing and/or

continuing to experience symptoms associated with neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

t.      Maintain awareness, closely supervise a patient's status, and intervene in to provide requisite and appropriate care for any changes in their condition after observing that the patient was experiencing symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

u.      Timely and appropriately recognize, in accordance with the standard of care, that a patient is  experiencing a life-threatening medical condition exhibiting signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder, and require the patient to

139

receive immediate and emergent care as managed by a qualified physician and/or the immediate emergency medical care and transportation for hospitalization;

v.     Timely and appropriately follow The National Scope Of Practice For Emergency Medical Technicians, The National Emergency Medical Education Standards, the State of Michigan Department of Health and Human Services Emergency Medical Services standards, the Emergency Cardiovascular Care guidelines, and the Muskegon County General Treatment Protocols for assessing, evaluating and treating patients with signs and symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

w.     Properly supervise any healthcare personnel, ensuring they adequately treat patients that present with and/or exhibit signs and/or symptoms of neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

x.     Timely consult and collaborate with appropriate medical specialists or providers, such as neurologists, nurses, mental health personnel, and other clinicians, to

establish optimal treatment plans and to achieve favorable patient outcomes;

y.     Recognize, communicate, and advocate the need and urgency of timely administering appropriate treatments, medications, and transfer to a higher level of care, including immediate hospitalization;

z.     Recognize, communicate, and advocate the need and urgency of timely performing interventions for a patient experiencing neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder;

aa.    Recognize, communicate, and advocate the need and urgency of immediate emergency medical care and hospitalization and/or immediate physician medical treatment for patients with emergent and life-threatening conditions that present with and/or exhibit signs and/or symptoms neurological disorder, head/brain injury, severe headache, dilated pupils, involuntary movements, seizure/shaking activity, decerebrate posturing, sepsis and/or infection, loss of balance, photophobia, abnormal urine laboratory results, fever, nausea, vomiting, confusion, delirium, disorientation, mental unresponsiveness, inability to follow directions and/or answer questions, dizziness, hypertension, tachycardia, and/or substance use disorder; and

bb.    Other acts of professional negligence yet to be determined.

261.    At all times relevant to the care and treatment of Tiffany Davis, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, failed in all respects to comply with the applicable standard of care and were, therefore, professionally negligent in the care and treatment of Decedent.

262.    The above breaches of the standard of care by Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, were the proximate cause of Tiffany Davis' untreated infection/sepsis and/or bleeding in the brain, which resulted due to the lack of diagnosis, treatment, and monitoring of Tiffany Davis' severe headaches, vomiting, fever, disorientation, dilated pupils, decerebrate posturing, and seizures, along with the many other neurological medical crisis symptoms as stated above.

263.    The above breaches of the standard of care by Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, were the proximate cause of Tiffany Davis' pain, suffering and subsequent death.

264.    That as a further consequence of the negligence described above, Plaintiff's decedent Tiffany Davis, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as she is entitled under the Wrongful Death Act, MCL 600.2922.

265.    Defendant Wellpath, through its agents and employees, including but not limited to, Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

266.     Defendant Muskegon County through its agents and employees, upon information and belief including but not limited to Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT, is liable for its professional negligence pursuant to the doctrine of *respondeat superior* and/or pursuant to *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240 (1978), as delineated above.

267.     Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT.

268.     Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Britni Brinkman, EMT, and Defendant Sara Bruce, EMT.

269.     That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.     Death;

b.     Reasonable medical, hospital, funeral and burial expenses;

c.     Conscious pain and suffering, physical and emotional;

d.     Humiliation and/or mortification;

e.     Mental anguish;

f.     Economic damages;

g.     Loss of love, society, and companionship;

h.     Loss of gifts, gratuities, and other items of economic value;

i.     Parental and spousal guidance, training, and support;

j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.      Attorney fees and costs if applicable;

l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

### COUNT XII:
### PROFESSIONAL NEGLIGENCE/ NEGLIGENCE/GROSS NEGLIGENCE
### (DEFENDANT JOSEPH NATOLE, JR., M.D. P.C.)

270.    Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

271.    Defendant Joseph Natole, Jr., M.D. P.C., through its agents and employees, failed in all respects to comply with the applicable standard of care pursuant to MCL 333.21513 and MCL 333.20141, and in conformance thereof, to:

a.      Provide Tiffany Davis proper medical care based on her own medical history and symptoms and/or medical conditions;

b.      Employ or contract with physicians and residents who possess  that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar localities;

c.      Adequately supervise, direct, monitor and control these healthcare professionals;

    d.      Draft, promulgate, adopt and/or enforce appropriate rules, regulations, policies, and procedures which would enable and engender its healthcare professionals, including but not limited to, its physicians, to render appropriate and timely treatment to patients looking to it for said treatment, including Tiffany Davis, and ensure the adequacy of the experience level and expertise of these professionals;

    e.      Joseph Natole, Jr., M.D. P.C., will be held vicariously liable for the professional actions of its agents, employees and ostensible agents as a matter of law, including but not limited to, Dr. Joseph Natole, Jr., MD;

    f.      Other acts of professional negligence yet to be determined.

272.    The above breaches of the standard of care by Defendant Joseph Natole, Jr., M.D. P.C., were the proximate cause of Tiffany Davis' untreated infection/sepsis and/or bleeding in the brain, which resulted due to the lack of diagnosis, treatment, and monitoring of Tiffany Davis' severe headaches, vomiting, fever, disorientation, dilated pupils, decerebrate posturing, and seizures, along with the many other neurological medical crisis symptoms as stated above.

273.    The above breaches of the standard of care by Defendant Joseph Natole, Jr., M.D. P.C. were the proximate cause of Tiffany Davis' pain, suffering and subsequent death.

274.    That as a further consequence of the negligence described above, Plaintiff's decedent Tiffany Davis, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as she is entitled under the Wrongful Death Act, MCL 600.2922.

275.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Dr. Natole.

276.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Dr. Natole.

277.    That the above described conduct of Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs if applicable;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT XIII:
## PROFESSIONAL NEGLIGENCE/ NEGLIGENCE/GROSS NEGLIGENCE
## (DEFENDANT WELLPATH)

278.    Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

279.    Defendant Wellpath through its agents and employees, failed in all respects to comply with the applicable standard of care pursuant to MCL 333.21513 and MCL 333.20141, and in conformance thereof, to:

a.    Provide Tiffany Davis proper medical care based on her own medical history and symptoms and/or medical conditions;

b.    Employ or contract with physicians, nurses, medical assistants, and emergency technicians who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar localities;

c.    Adequately supervise, direct, monitor and control these healthcare professionals;

d.    Draft, promulgate, adopt and/or enforce appropriate rules, regulations, policies, and procedures which would enable and engender its healthcare professionals, including but not limited to, its physicians, nurses, medical assistants, and emergency technicians, to render appropriate and timely treatment to patients looking to it for said treatment, including Tiffany Davis, and ensure the adequacy of the experience level and expertise of these professionals;

147

     e.      Wellpath LLC formerly known as Correct Care Solutions, LLC will be held vicariously liable for the professional actions of its agents, employees and ostensible agents as a matter of law, including but not limited to, Defendant Medical Personnel;

     f.      Other acts of professional negligence yet to be determined.

280.   The above breaches of the standard of care by Defendant Wellpath were the proximate cause of Tiffany Davis' untreated infection/sepsis and/or bleeding in the brain, which resulted due to the lack of diagnosis, treatment, and monitoring of Tiffany Davis' severe headaches, vomiting, fever, disorientation, dilated pupils, decerebrate posturing, and seizures, along with the many other neurological medical crisis symptoms as stated above.

281.   The above breaches of the standard of care by Defendant Wellpath were the proximate cause of Tiffany Davis' pain, suffering and subsequent death.

282.   That as a further consequence of the negligence described above, Plaintiff's decedent Tiffany Davis, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as she is entitled under the Wrongful Death Act, MCL 600.2922.

283.   Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Medical Personnel.

284.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Medical Personnel.

285.    That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.    Loss of love, society, and companionship;

h.    Loss of gifts, gratuities, and other items of economic value;

i.    Parental and spousal guidance, training, and support;

j.    Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.    Attorney fees and costs if applicable;

l.    Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-

Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

## COUNT XIV:
## PROFESSIONAL NEGLIGENCE/ NEGLIGENCE/GROSS NEGLIGENCE
## (DEFENDANT MUSKEGON COUNTY)

286.     Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein.

287.     Defendant Muskegon County, through its agents and employees, failed in all respects to comply with the applicable standard of care pursuant to MCL 333.21513 and MCL 333.20141, and in conformance thereof, to:

a.     Provide Tiffany Davis proper medical care based on her own medical history and symptoms and/or medical conditions;

b.     Employ or contract with physicians, nurses, medical assistants, and emergency technicians who possess that degree of skill and learning ordinarily possessed and exercised by practitioners of their profession in the same or similar localities;

c.     Adequately supervise, direct, monitor and control these healthcare professionals;

d.     Draft, promulgate, adopt and/or enforce appropriate rules, regulations, policies, and procedures which would enable and engender its healthcare professionals, including but not limited to its physicians, nurses, medical assistants, and emergency technicians to render appropriate and timely treatment to patients looking to it for said treatment, including Tiffany Davis, and ensure the adequacy of the experience level and expertise of these professionals;

e.      Muskegon County Sheriff's Office will be held vicariously liable for the professional actions of its agents, employees and ostensible agents as a matter of law, including but not limited to Defendant Medical Personnel;

f.      Other acts of professional negligence yet to be determined.

288.    The above breaches of the standard of care by Defendant Muskegon County were the proximate cause of Tiffany Davis' untreated infection/sepsis and/or bleeding in the brain, which resulted due to the lack of diagnosis, treatment, and monitoring of Tiffany Davis' severe headaches, vomiting, fever, disorientation, dilated pupils, decerebrate posturing, and seizures, along with the many other neurological medical crisis symptoms as stated above.

289.    The above breaches of the standard of care by Defendant Muskegon County were the proximate cause of Tiffany Davis' pain, suffering and subsequent death.

290.    That as a further consequence of the negligence described above, Plaintiff's decedent Tiffany Davis, was caused to sustain severe physical pain and suffering as well as mental and emotional distress. The above breaches for the standard of care were the proximate cause of the conscious pain and suffering sustained by the Plaintiff's decedent, loss of financial support, loss of earning capacity, funeral and burial expenses, and loss of consortium and/or companionship. Plaintiff prays for such damages as she is entitled under the Wrongful Death Act, MCL 600.2922.

291.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of ordinary negligence against Defendant Medical Personnel.

292.    Pleading in the alternative, Plaintiff hereby restates and re-alleges each and every allegation contained in the above paragraphs as if fully set forth herein in support of the theory of gross negligence against Defendant Medical Personnel.

293.     That the above described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

   a.      Death;

   b.      Reasonable medical, hospital, funeral and burial expenses;

   c.      Conscious pain and suffering, physical and emotional;

   d.      Humiliation and/or mortification;

   e.      Mental anguish;

   f.      Economic damages;

   g.      Loss of love, society, and companionship;

   h.      Loss of gifts, gratuities, and other items of economic value;

   i.      Parental and spousal guidance, training, and support;

   j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

   k.      Attorney fees and costs if applicable;

   l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

   WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

**COUNT XV:**
**STATE LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(DEFENDANT DEPUTIES AND DEFENDANT MEDICAL PERSONNEL)**

294.    Plaintiff repeats, realleges, and incorporates all other paragraphs of this complaint as if fully set forth herein.

295.    In the manner described more fully above, Defendant Deputies and Defendant Medical Personnel engaged in extreme and outrageous conduct.

296.    By subjecting Tiffany Davis to deliberate indifference to her serious medical needs, and cruel and unusual punishment, Defendant Deputies and Defendant Medical Personnel either intended that their conduct would cause severe emotional distress to Tiffany Davis or knew that there was a high probability that their conduct would cause severe emotional distress to her.

297.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

298.    As a proximate result of this misconduct, undertaken pursuant to the Defendant Muskegon County and Defendant Wellpath's policy and practice as described above, Tiffany Davis suffered injuries including but not limited to severe emotional distress.

299.    That the above-described conduct of the Defendants, as specifically set forth above, was the proximate cause of Plaintiff's Decedent Tiffany Davis' death and other injuries and damages to her and her Estate, including but not limited to the following:

a.    Death;

b.    Reasonable medical, hospital, funeral and burial expenses;

c.    Conscious pain and suffering, physical and emotional;

d.    Humiliation and/or mortification;

e.    Mental anguish;

f.    Economic damages;

g.      Loss of love, society, and companionship;

h.      Loss of gifts, gratuities, and other items of economic value;

i.      Parental and spousal guidance, training, and support;

j.      Exemplary, compensatory, and punitive damages allowed under Michigan and federal law;

k.      Attorney fees and costs if applicable;

l.      Any and all other damages otherwise recoverable under federal law and the Michigan Wrongful Death Act, MCL 600.2922, et seq.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, and award an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees, as well as punitive and exemplary damages.

Respectfully submitted,

By:     /s/ Marcel S. Benavides
        Marcel S. Benavides, P69562
        Attorney for PLAINTIFF
        801 W. Eleven Mile Road, Ste. 130
        Royal Oak, MI 48067
        (248) 549-8555
        benavideslaw@att.net

Dated: February 17, 2022

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

---

GRACIE MICHAEL Individually and as
Personal Representative for the Estate of
Tiffany Davis, Deceased

      PLAINTIFF

    -vs-                                           Case No.

                                                    HON.

COUNTY OF MUSKEGON, a municipal corporation, and
SHERIFF MICHAEL POULIN; LT. MATTHEW SMITH;
DEPUTY RICHARD VAN AMBURG; DEPUTY CHRISTOPHER ROOT;
DEPUTY SCOTT SMITH; DEPUTY JAMAL LANE;
DEPUTY TIFFANY TEMPLE; DEPUTY CARRIE SCHUBERT;
DEPUTY SHAWN AHRENS;
and other UNKNOWN DEPUTIES;
WELLPATH, LLC, formerly known as CORRECT CARE SOLUTIONS, LLC;
JOSEPH NATOLE, JR., M.D. P.C.; DR. JOSEPH NATOLE, MD;
HEATHER IHRIG; DAVID LOPEZ, LPN;
DANIELLE CARLSON, RN; CARLEEN BLANCHE, RN;
BRITNI BRINKMAN, EMT; SARA BRUCE, EMT;
JESSICA ANN FAIRBANKS, LPN; KATY CASTILLO, LPN;
JANE DOE; and JOHN DOE;
Individually, and in their official / supervisory capacities,
Jointly and Severally,

      DEFENDANTS.                              JURY TRIAL DEMANDED
_____/

**MARCEL S. BENAVIDES (P69562)**
THE MARCEL S. BENAVIDES LAW OFFICE
Attorney for PLAINTIFF
801 West Eleven Mile Rd. Ste. 130
Royal Oak, MI 48067
(248) 549-8555
benavideslaw@att.net
_____/

<u>**PLAINTIFF DEMANDS A TRIAL BY JURY**</u>

**NOW COMES** the PLAINTIFF, Gracie Michael, individually and as Personal Representative for the Estate of Tiffany Davis ("Decedent"), and through her attorney, **MARCEL S. BENAVIDES**, and demands a trial by jury in this matter.

Respectfully submitted,

By:    /s/ Marcel S. Benavides

Marcel S. Benavides, P69562
Attorney for PLAINTIFF
801 W. Eleven Mile Road, Ste. 130
Royal Oak, MI 48067
(248) 549-8555
benavideslaw@att.net

Dated: February 17, 2022